850 P.2d 100

**STATE of Arizona, Appellee,**

v.

**Mickel William HERRERA, Appellant.**

**No. CR–89–0372–AP.**

Supreme Court of Arizona,
En Banc.

March 4, 1993.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Div., Phoenix, for the State.

John C. Williams, Prescott, for appellant.

## OPINION

JAMES DUKE CAMERON, Justice (Retired).

In October 1989, a Maricopa County jury convicted appellant Mickel William Herrera (defendant) of first degree felony murder, aggravated robbery, and kidnapping. The trial court sentenced defendant to death on the murder conviction, to 21 years' imprisonment on the kidnapping conviction, and to 10 years' imprisonment on the aggravated robbery conviction, with the sentences to run consecutively. In this automatic appeal, defendant challenges his murder conviction and death sentence. *See* A.R.S. § 13–4033; rules 26.15, 31.2(b), and 31.-15(a)(3), Arizona Rules of Criminal Procedure. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. §§ 13–4031, –4033, and –4035. For the following reasons, we affirm defendant's convictions, but reduce the death sentence to life imprisonment without possibility of parole for 25 years.

## ISSUES PRESENTED

The following issues are raised in this appeal:[1]

1. Did the trial court err by denying defendant's motion for judgment of acquittal on the felony murder charge?

2. Did the trial court err by refusing to sever defendant's trial from that of his brother, William Herrera, Jr., and later allowing the introduction of Junior's post-arrest statement at trial?

3. Did the trial court err by excluding the post-arrest statement of defendant's brother, Ruben Herrera?

4. Did the trial court err by overruling defendant's objection to the prosecutor's closing argument?

5. Was the trial court precluded from making the *Enmund* finding once the jury convicted defendant of felony murder rather than premeditated murder?

6. Did the trial court err by finding that defendant murdered the victim in an "especially heinous, cruel or depraved manner"?

7. Did the trial court err by determining that defendant's age, a statutory mitigating circumstance, was not sufficiently substantial to call for leniency?

8. Did the trial court err by finding that defendant's dysfunctional family background, a non-statutory mitigating circumstance, was not sufficiently substantial to call for leniency?

---

1. Defendant also makes the following 6 assertions which, after review, we reject without further discussion:

    1. The death qualification of the jury deprived defendant of his right to an impartial jury. *See State v. LaGrand*, 153 Ariz. 21, 33, 734 P.2d 563, 575 (1987) (similar assertion rejected); *State v. Martinez–Villareal*, 145 Ariz. 441, 449, 702 P.2d 670, 678 (1985) (same).

    2. The death sentence was improperly imposed because defendant's trial lawyer did not death qualify the trial judge. *See State v. Rossi II*, 154 Ariz. 245, 248, 741 P.2d 1223, 1226 (1987) (there is no constitutional right to voir dire a trial judge before sentencing).

    3. Arizona's death penalty statute is unconstitutional because it fails to provide guidance to the trial judge. *See State v. Beaty*, 158 Ariz. 232, 246–47, 762 P.2d 519, 533–34 (1988) (identical assertion rejected).

    4. Arizona's death penalty statute is unconstitutional because it is imposed arbitrarily and irrationally. *See generally Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (Arizona's death penalty statute upheld as constitutional because it is not imposed arbitrarily or irrationally), *aff'g State v. Walton*, 159 Ariz. 571, 769 P.2d 1017 (1989).

    5. Arizona's death penalty statute is unconstitutional because it imposes cruel and unusual punishment. *See State v. Williams*, 166 Ariz. 132, 142, 800 P.2d 1240, 1250 (1987) (execution by lethal gas not cruel and unusual punishment), *cert. denied*, —— U.S. ——, 111 S.Ct. 2043, 114 L.Ed.2d 128 (1991); *State v. Harding*, 137 Ariz. 278, 292, 670 P.2d 383, 397 (1983) (Arizona's death penalty statute is not capricious and withstands any claim that its application constitutes cruel and unusual punishment or violates due process).

    6. Arizona's death penalty statute is unconstitutional because a prosecutor's discretion to seek the death penalty is without standards. *See Harding*, 137 Ariz. at 292, 670 P.2d at 397 (identical assertion rejected).

9. Did the trial court err by failing to find the existence of the mitigating circumstance of duress, A.R.S. § 13–703(G)(2)?

10. Did the trial court improperly fail to consider defendant's prior work history and lack of a prior felony record as non-statutory mitigating circumstances?

## FACTS AND PROCEDURAL HISTORY

On the afternoon of June 30, 1988, defendant and his girlfriend, Mary Cardenas, went driving with his father, William Diaz Herrera, Sr. (Senior), and defendant's brothers, William Diaz Herrera, Jr. (Junior) and Ruben Herrera. The family travelled in two cars, a gold Plymouth Duster and a blue Chevrolet pickup. After purchasing beer and wine, they drove to a relatively isolated dirt road in southwest Phoenix where they stopped to allow the Duster, which had begun to overheat, to cool down. They parked the cars parallel to each other facing into some trees and shrubbery on the side of the road and began drinking, listening to music, and talking. With the exception of Senior, each of the Herreras was under the age of 21.

An hour passed without incident before a motorist, seeing the positioning of the two vehicles and believing that an accident had occurred, flagged down Sheriff's Deputy Vernon Marconnet (the deputy) and told him about the possible accident. When the deputy arrived at the Herreras' location, he approached the family and asked if there was a problem. Defendant responded that the Duster had overheated. The deputy then asked everyone for identification. Ruben produced an I.D., but defendant told the deputy that he had no I.D. because his wallet had been stolen; Junior also said that he had lost his I.D. When the deputy asked Senior for an I.D., Senior became belligerent and stated that he knew the law, that he had done nothing wrong, and that he "wasn't going to show any fucking I.D." The deputy responded that if Senior refused to show his I.D., he would have to "book" Senior. The deputy then walked Senior over to the patrol car and placed him in the back seat.

Deputy Marconnet next asked Ms. Cardenas, who was sitting in the pickup, for the vehicle's registration. About this time, Junior, who had jumped his burglary probation in Texas and was worried about being arrested, told defendant that he was going to fight the deputy. When the deputy again approached Junior and requested his I.D., Junior began to argue with him. At some point, the deputy requested a police backup. Junior's argument with the deputy quickly escalated into a scuffle, and Junior grabbed the deputy and hit him a few times. By this time, Ruben had released Senior from the patrol car, and Senior joined the fray, kneeing or kicking the deputy in the groin and cussing at him. At Junior's urging, defendant wrestled the deputy's revolver away from him and ordered him two or three times to get down on the ground. Junior then threw the deputy's portable radio, which he had grabbed during the scuffle, at the deputy and caused a severe laceration in the deputy's forehead.

There is conflicting evidence about what happened next. Ms. Cardenas testified at trial that as she was leaning over in the pickup looking through the glove compartment for the vehicle's registration papers, she heard defendant say "freeze." She immediately sat up and saw defendant point the gun at Deputy Marconnet while Junior shouted, "shoot him, shoot him." Although her view was somewhat limited because of the positioning of the vehicles, Ms. Cardenas testified that she saw defendant shoot the deputy.

The information provided by defendant in his first interview with investigators is largely consistent with Ms. Cardenas' version of the shooting. Defendant admitted that he held the deputy's gun on him for up to two or three minutes. During this time, the deputy lay on his back and, according to Mickel, appeared to want to say, "Just put it down." But when Senior and Junior shouted "shoot him, shoot him," defendant shot the deputy. At his second interview, defendant first claimed that Junior shot the deputy, but then stated that he himself shot the deputy.

During his third interview and at trial, however, defendant claimed that when Senior and Junior told him to shoot the deputy, he refused. Senior then took the gun from defendant, shot the deputy, and handed the gun back to him, telling him to "get rid of it." When questioned about the conflicting stories, defendant testified that during his first two interviews, "I didn't know what I was thinking; I was confused."

After the shooting, the family fled the crime scene in the two vehicles. Junior, Ruben and Senior fled in the Duster toward Casa Grande. As they drove along the interstate, a tire blew out. Junior and Ruben then separated from Senior and spent the night wandering in the desert before going to the Casa Grande hospital, where they turned themselves in. Defendant and Ms. Cardenas fled in the pickup truck. They immediately picked up defendant's brother, Tony Huerta, from work, and defendant told him, "I shot a cop today." After returning to the family's apartment, defendant hid the deputy's gun in some bushes. Later that night, defendant checked into a motel, where he was arrested.

When backup officers arrived at the scene, they found Deputy Marconnet's body. He had been shot once through the right eye, he had a gash on his left forehead, dirt was embedded in the buttocks, crotch, and leg areas of his trousers, and his metal name plate was bent. The medical examiner determined that the deputy died from a gunshot to the head at close range. He also found powder burns on the deputy's hands, which indicated that his hands were in front of his face when the gun was fired.

Additional physical evidence at the scene indicated that a scuffle preceded the deputy's death. Investigators found several scuff marks on the ground, and they located the deputy's sun glasses approximately 8 feet from his body. The deputy's portable police radio was found in some grass or brush about 12 to 13 feet from his body. Ruben's fingerprint was positively identified on the right rear door of the deputy's patrol car.

Defendant, Junior and Senior were each indicted on one count of first degree murder, one count of aggravated robbery, and one count of kidnapping. The trial court severed Senior's trial from that of defendant and Junior, who went to trial together before the trial of Senior. Senior was convicted of first degree felony murder and kidnapping, and he was sentenced to death and a lengthy prison term. Ruben also faced murder, aggravated assault, and kidnapping charges. He pleaded guilty to the kidnapping charge in exchange for his testimony at Senior's trial, and he was sentenced to 10 years' imprisonment.

At the close of the evidence at defendant and Junior's joint trial, the jury was instructed on both felony and premeditated first degree murder. The felony murder charge was predicated upon aggravated robbery and/or kidnapping. The jury convicted both defendant and Junior of first degree felony murder, aggravated robbery, and kidnapping. The trial court sentenced defendant to death for the murder, to 21 years' imprisonment for the kidnapping, and to 10 years' imprisonment for the aggravated robbery. The trial court sentenced Junior to death for the murder, to life imprisonment for the kidnapping, and to 10 years' imprisonment for the aggravated robbery.

With regard to defendant's death sentence, the trial court found the existence of one aggravating circumstance: the murder was committed in an especially heinous, cruel or depraved manner. The trial court also found the existence of one statutory and one non-statutory mitigating circumstance: defendant's age—18 at the time of the murder—under A.R.S. § 13–703(G)(5), and defendant's deprived childhood and physically abusive father. However, the trial court further determined that the mitigating circumstances were not sufficiently substantial to call for leniency.

## DISCUSSION

### I. TRIAL ISSUES

#### A. *Denial of Motion for Acquittal on the Felony Murder Charge*

■ Defendant argues that the trial court improperly denied his rule 20, Ari-

zona Rules of Criminal Procedure, motion for judgment of acquittal on the felony murder charge because the evidence was insufficient to sustain the felony murder verdict. He contends that the prosecution did not establish that the deputy's "death result[ed] *from an action taken to facilitate* the accomplishment of one or more of the felonies enumerated in § 13–1105(A)(2)." *State v. Arias*, 131 Ariz. 441, 443, 641 P.2d 1285, 1287 (1982) (emphasis added). In support of his argument that the prosecution did not meet its burden of proof, defendant cites the trial court's apparent reluctance to submit the felony murder charge to the jury because the evidence did not show that the defendant "started out to commit some other type of felony and ended up in murder...."

We believe that the trial court properly denied defendant's motion. "[T]he trial court has no duty to direct an acquittal where there is substantial evidence that a defendant has committed the crime charged," *State v. Mosley*, 119 Ariz. 393, 402, 581 P.2d 238, 247 (1978), and "[u]nless there is a complete absence of probative evidence to support a particular finding, it is appropriate to submit the issue to the jury." *State v. Lopez*, 158 Ariz. 258, 262, 762 P.2d 545, 549 (1988), *citing State v. Girdler*, 138 Ariz. 482, 488, 675 P.2d 1301, 1307 (1983). "Substantial evidence" means

> [m]ore than a scintilla and is such proof as a reasonable mind would employ to support the conclusion reached. It is of a character which would convince an unprejudiced thinking mind of the truth of the fact to which the evidence is directed. If reasonable men may fairly differ as to whether certain evidence establishes a fact in issue, then such evidence must be considered as substantial.

*State v. Tison*, 129 Ariz. 546, 553, 633 P.2d 355, 362 (1981).

Under A.R.S. § 13–1105(A)(2), a person commits felony murder if:

> Acting either alone or with one or more other persons such person commits or attempts to commit ... kidnapping under § 13–1304, ... [or] robbery under § 13–1902, 13–1903 or 13–1904 ... and in the

course of and in furtherance of such offense or immediate flight from such offense, such person or another person causes the death of any person.

We find that the prosecution introduced substantial evidence to support defendant's aggravated robbery and kidnapping convictions, two of the felonies enumerated in the felony murder statute. We also find that there is substantial evidence supporting the jury's determination that the deputy's murder resulted from an act taken to facilitate the deputy's kidnapping. The trial court therefore appropriately submitted the felony murder charge to the jury, and we find no error.

### 1. *Aggravated Robbery Conviction*

■ Defendant was convicted of aggravated robbery pursuant to A.R.S. § 13–1903, which defines aggravated robbery as "committing robbery as defined in § 13–1902 ... aided by one or more accomplices actually present." Section 13–1902 defines robbery as "taking any property of another from his person or immediate presence and against his will ... [and] threaten[ing] or us[ing] force against any person with intent either to coerce surrender of property or to prevent resistance to such person taking or retaining property." " 'Force' sufficient to constitute robbery may either be before, or at the time of the taking, and it must be of such a nature as to show that it was intended to overpower the party robbed." *State v. Bishop*, 144 Ariz. 521, 524, 698 P.2d 1240, 1243 (1985), *citing Lear v. State*, 39 Ariz. 313, 315, 6 P.2d 426, 427 (1931).

The evidence indicates that defendant forcibly deprived the deputy of his gun. During his post-arrest interviews with detectives, defendant stated that after the scuffle with the deputy escalated, he physically grabbed the deputy's gun out of his hands as the deputy tried to remove his gun from his holster. Defendant also admitted at trial that he had physically wrested the gun from the deputy. This act constitutes the use of force against the deputy for the purpose of depriving him of his property. In addition, this act occurred while Junior was physically present and

participating in the scuffle. Junior's presence elevated the crime to aggravated robbery. We find substantial evidence to support defendant's aggravated robbery conviction.

## 2. *Kidnapping Conviction*

■ Defendant was convicted of kidnapping, pursuant to A.R.S. § 13–1304(A), which states:

A person commits kidnapping by knowingly restraining another person with the intent to:

. . . .

3. Inflict death, physical injury or a sexual offense on the victim, or to otherwise aid in the commission of a felony; or

4. Place the victim or a third person in reasonable apprehension of imminent physical injury to the victim or such third person[; or]

5. Interfere with the performance of a governmental or political function.

Based on the trial court's instruction, which tracked § 13–1304(A) virtually verbatim, the jury found defendant guilty of kidnapping, but its verdict did not specify upon which element of the kidnapping statute it relied. Because the statute is worded in the disjunctive, the jury could have based its verdict on any *one* of these three subsections. *See State v. Bruni*, 129 Ariz. 312, 317, 630 P.2d 1044, 1049 (App.1981). We find that the state introduced sufficient evidence to support defendant's kidnapping conviction under subsection 5 of the kidnapping statute.

We find substantial evidence that at the time he took the deputy's gun and ordered the deputy to lie down on the ground, defendant restrained the deputy and intended to and did interfere with the deputy's performance of a governmental function—law enforcement. Both defendant and Junior were concerned about being arrested. Defendant was drinking illegally, and Junior had violated his Texas probation by travelling to Arizona. In addition, Ruben recently had been released from a juvenile facility. Defendant knew that Deputy Marconnet probably would arrest one or more of

the Herreras, and the deputy had already placed Senior in the back of the patrol car. Because they wanted to avoid this outcome, defendant and Junior decided to overpower the deputy so that they could handcuff him and escape. By fighting with the deputy, obtaining his gun, and ordering him to lie down on the ground, defendant intended to interfere with the deputy's law enforcement function in order to facilitate his family's escape. Thus, substantial evidence supports the defendant's kidnapping conviction under A.R.S. § 13–1304(A)(5).

## 3. *Felony Murder Conviction*

■ Because we have decided that substantial evidence supports defendant's aggravated robbery and kidnapping convictions, we must now determine whether the deputy's murder was caused in the course of and in furtherance of either of these crimes. *See* A.R.S. § 13–1105(A)(2). A death is "in furtherance" of an underlying offense if the death resulted from any action taken to facilitate the accomplishment of the felony. *State v. Hallman*, 137 Ariz. 31, 38, 668 P.2d 874, 881 (1983); *Arias*, 131 Ariz. at 443, 641 P.2d at 1287. Whether a death is "in furtherance" of an underlying felony is ordinarily a question to be determined by the trier-of-fact, *Hallman*, 137 Ariz. at 38, 668 P.2d at 881, and because there is substantial evidence supporting the jury's felony murder verdict, we conclude that the trial court appropriately submitted the instruction to the jury. *See Mosley*, 119 Ariz. at 402, 581 P.2d at 247 (no duty to direct acquittal if there is substantial evidence that defendant committed crime charged).

■ Defendant contends that he was improperly convicted of felony murder because he murdered the deputy to facilitate the prevention of an arrest, not to facilitate the aggravated robbery and/or the kidnapping. We disagree.

Defendant correctly claims that the deputy's death resulted from defendant's attempt to prevent an arrest. This fact, however, does not support defendant's conclusion that the deputy's murder did not facilitate an underlying felony. As noted above,

defendant's attempt to prevent an arrest was an attempt to interfere with the deputy's performance of a governmental function—an act which meets the statutory definition of kidnapping. Thus, the deputy's death did in fact facilitate the accomplishment of the kidnapping. We find, therefore, that the trial court properly denied defendant's motion for judgment of acquittal.

B. *Denial of Trial Severance and Admission of Junior's Post–Arrest Statement*

■ Relying on *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), defendant contends that certain post-arrest statements made by Junior, a non-testifying codefendant, were admitted at trial in violation of the confrontation clause of the Sixth Amendment of the United States Constitution. *Bruton* held that a defendant is deprived of his right of confrontation when a non-testifying codefendant's confession inculpating defendant is introduced at trial, even if the trial court instructs the jury to consider the confession only against the codefendant. 391 U.S. at 124–26, 88 S.Ct. at 1621–22. This holding created an exception to the general rule that a jury is presumed to follow its instructions. *Bruton,* 391 U.S. at 135–37, 88 S.Ct. at 1627–28. In *Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987), however, the Supreme Court clarified the application of its *Bruton* exception, and held that the confrontation clause is not violated by the admission of a non-testifying codefendant's confession if the trial court gives a proper limiting instruction, the redacted confession eliminates the defendant's name and any reference to his existence, and the prosecutor does not "undo the effect of the limiting instruction by urging the jury to use" the non-testifying codefendant's confession against the defendant. In such an instance it is assumed that jurors will follow their instructions and apply the redacted statement only against the codefendant. *Richardson,* 481 U.S. at 208–09, 107 S.Ct. at 1708.

Relying on *Richardson,* the trial court denied defendant's motion to sever his trial from that of Junior, even though Junior's post-arrest statements were to be introduced against Junior at trial. The trial court redacted the statements to remove direct references to defendant and twice instructed the jury that Junior's confession could be used only against Junior.

Defendant maintains on appeal, however, that the trial court did not adequately remove all references to defendant. Defendant contends that the trial court erroneously admitted Junior's statement that he heard his father yell "shoot him, shoot him" because the statement implied that defendant was the shooter. The subject of the sentence "shoot him, shoot him" is the implied pronoun "you," and in light of other evidence introduced at trial, defendant was the only possible "you." We do not believe that the admission of the challenged statement violated defendant's constitutional right of confrontation.

The admission of the redacted statement did not violate *Richardson* because it contained no direct reference to defendant, was not facially incriminating, and did not directly refer to defendant's existence. The statement became incriminating only when linked with other evidence introduced at trial, including defendant's own trial testimony that he was holding the gun when Senior said "shoot him, shoot him." Furthermore, Junior's statement does not establish that defendant actually shot the deputy because it is ambiguous about whether defendant retained possession of the gun after Senior shouted "shoot him," or whether, as defendant testified at trial, Senior took the gun from defendant and shot the deputy. Because Junior's statement does not incriminate defendant without the linkage provided by other evidence, we presume that the jury followed the trial court's instruction to use Junior's confession only against Junior. *See Richardson,* 481 U.S. at 208–09, 107 S.Ct. at 1708. Furthermore, in his closing argument, the prosecutor did not urge the jury to use Junior's confession against defendant. Thus, the trial court's admission of the

challenged statement did not violate the confrontation clause.

## C. *Exclusion of Ruben's Post–Arrest Statement*

■ Defendant claims that the trial court erred by refusing to admit a post-arrest statement of his younger brother, Ruben. The claimed "gist" of Ruben's purported statement was that Ruben let Senior out of the patrol car, and Senior then shot the deputy. Defendant contends that Ruben's statement is admissible as a hearsay exception under rule 804(b)(3), Arizona Rules of Evidence. We cannot review and find error with the trial court's exclusion of Ruben's statement, however, because there is no evidence in the record indicating exactly what ·Ruben said. Ruben's statement was not marked for identification or formally offered into evidence at trial, and no copy of it is a part of the record on appeal. *See Kerley Chemical Corp. v. Producers Cotton Oil Co.*, 2 Ariz. App. 56, 58, 406 P.2d 258, 260 (1965) (without transcript of excluded testimony, appellate court could not reverse trial court's judgment on basis of prejudicial error).

Furthermore, even if Ruben did state that Senior shot the deputy, his statement is irrelevant. Defendant was convicted of felony murder and acquitted of premeditated murder. Defendant, by his own admission, took part in the kidnapping and robbery. Therefore, defendant is guilty of felony murder as an accomplice, even if, as he now claims Ruben stated, Senior actually pulled the trigger. A.R.S. § 13–1105(A)(2).

## D. *The Prosecutor's Comments at Closing Argument*

■ Defendant argues that the trial court erred by overruling his objection to the prosecutor's "inflammatory" closing argument. Defendant maintains that the prosecutor inappropriately appealed to the jurors' prejudices and passions by urging them to convict defendant in order to "do justice" and to maintain "law and order." *See United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C.Cir.1984) ("A prosecutor may not urge jurors to convict a criminal

defendant in order to protect community values, preserve civil order, or deter future law breaking."). We do not find the prosecutor's comments to be prejudicial to the defendant.

■ At closing argument, the prosecutor stated:

Now, it is as important to the state, who represents all citizens co-equally, that the correct person be identified as the person who did the crimes; that's why the evidence is marshalled. It is crucial, because I, of the state, have no interest, whatsoever, in convicting an innocent person. The state must have an interest only in marshalling sufficient evidence to convince you, beyond a reasonable doubt, that a person is guilty of that. If you find them guilty—that burden of proof remains until you leave this room and go to deliberate; that is the presumption of innocence because we are all, all of us are citizens, all of us could be vulnerable, but if we or anyone, and in this case, these defendants, having committed these crimes, then it is as important to our civilized society to maintain some semblance of stability, balance, law and order, whatever you call it.

. . . .

To convict these defendants for the crimes charged based upon that evidence and law.

Then, if the state has met its burden and the law does apply, then you do your duty so a civilized society can keep going as we honor it in our country today; that's justice. I ask you to do justice.

Trial attorneys are generally granted wide latitude in presenting their closing arguments. *State v. Blazak*, 114 Ariz. 199, 204, 560 P.2d 54, 59 (1977); *State v. Gonzales*, 105 Ariz. 434, 436–37, 466 P.2d 388, 390–91 (1970). A prosecutor exceeds this authority when he uses his remarks "to inflame the minds of jurors with passion or prejudice or influence the verdict in any degree." *State v. Merryman*, 79 Ariz. 73, 75, 283 P.2d 239, 241 (1955).

We find that the prosecutor's statements did not violate defendant's rights. When read in context, the prosecutor's state-

ments about justice and protecting society do nothing more than tell the jury that, *if they find defendant guilty beyond a reasonable doubt,* then they have a duty to protect our society and our system of justice by returning a guilty verdict; justice is served when a jury requires the state to meet its burden of proof. The statements did not improperly appeal to the jurors' emotions, passions, or prejudices by urging them to convict defendant "for reasons wholly irrelevant to his own guilt or innocence." *Monaghan,* 741 F.2d at 1441.

## II. SENTENCING ISSUES

### A. *The Enmund Finding*

■ Following the recommendation in *State v. Walton,* 159 Ariz. 571, 592, 769 P.2d 1017, 1038 (1989) (Feldman, J., concurring), *aff'd, Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the trial judge required the jury to make a specific finding about defendant's guilt by returning a verdict form designating whether it found defendant guilty of premeditated murder or felony murder. The jury convicted defendant of felony murder, thereby acquitting him of premeditated murder. At sentencing, the trial judge determined that "defendant intended to kill and was the one who killed [the deputy] by firing one bullet from the deputy's gun into his head." The trial judge made this finding pursuant to *Enmund v. Florida,* 458 U.S. 782, 798, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982), which held that before a defendant convicted of felony murder may be sentenced to death, a finding must be made that the defendant in fact killed, attempted to kill, or intended to kill. Defendant argues that because the jury found defendant guilty of felony murder, the judge was precluded from finding that defendant was the shooter and that he intended to kill. In essence, defendant argues that the jury implicitly found that defendant did not kill or intend to kill, and that the trial court's *Enmund* finding conflicted with the jury's verdict.

We find that the trial court correctly made the *Enmund* finding. The trial court's finding does not conflict with the jury's felony murder verdict. The jury's premeditated murder acquittal indicates only that the jury found that defendant did not *premeditate* the murder—it does not mean that the jury found that defendant did not kill the deputy or did not intend to kill the deputy. The jury could convict defendant of felony murder while concluding that he was the shooter. The evidence in this case overwhelmingly supports the trial court's conclusion that defendant intended to kill and in fact did kill. We hold that the sentencing judge may make an *Enmund* finding after a jury specifically convicts a defendant of felony murder.

### B. *The Death Sentence*

#### 1. *Aggravating Circumstances*

■ The death penalty may be imposed only if at least one of 10 statutory aggravating circumstances exists. A.R.S. § 13–703(E); *State v. Rockwell,* 161 Ariz. 5, 14, 775 P.2d 1069, 1078 (1989). The state must prove an aggravating circumstance "beyond a reasonable doubt." *State v. Richmond,* 136 Ariz. 312, 322, 666 P.2d 57, 67 (1983). In this case, the trial court found one aggravating factor: defendant committed the murder in an especially heinous, cruel or depraved manner pursuant to § 13–703(F)(6).

■ Defendant argues that the trial court's finding is erroneous because it is not supported by the evidence produced at trial. However, we believe that the record supports the trial court's conclusion that the deputy suffered both physical abuse and mental anguish before his death, and we agree with the trial court that this murder was committed in an especially cruel manner. See our discussion of this issue in our opinion, in *State v. Herrera, Jr. I,* 174 Ariz. 372, 378, 850 P.2d 85, 91 (1993).[2]

---

**2.** Because we reduce defendant's death sentence to life, we do not consider whether Junior's statements supporting the trial court's finding of

cruelty were properly considered by the trial court when sentencing defendant.

We do *not* consider A.R.S. § 13–703(F)(10) (murder of peace officer) as an aggravating circumstance because its effective date was *after* Deputy Marconnet's murder. Laws 1988, Ch. 155, § 1.

### 2. *Mitigating Circumstances*

When sentencing a defendant convicted of first degree murder, the trial court must consider, in addition to the factors set out in A.R.S. § 13–703(G), "any aspect of the defendant's character or record and any circumstance of the offense relevant to determining" whether the death penalty should be imposed. *State v. McCall,* 139 Ariz. 147, 162, 677 P.2d 920, 935 (1983) (citation omitted). Although the trial court must consider all evidence offered by the defendant in mitigation, "it is within the discretion of the trial judge how much weight should be given to the proffered mitigating factors." *State v. Fierro,* 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990), *citing Jeffers v. Ricketts,* 627 F.Supp. 1334, 1357 (D.Ariz.1986). The defendant must prove the existence of a mitigating factor by a preponderance of the evidence. *Fierro,* 166 Ariz. at 551, 804 P.2d at 84.

Here, the trial court found the existence of one statutory mitigating circumstance, defendant's age (18) at the time of the murder, and one non-statutory mitigating circumstance, defendant's deprived childhood. However, the trial court found that these circumstances were not sufficiently substantial to call for leniency. We now review the trial court's mitigation findings.

### a. Age

Age is a mitigating factor pursuant to A.R.S. § 13–703(G)(5). Because defendant was 18 years old at the time of the murder, we agree with the trial court's conclusion that defendant's age is a mitigating circumstance. We also agree with the trial court, however, that this circumstance alone is not sufficiently substantial to call for leniency. When a trial court considers the age of a defendant in mitigation, it considers not only the defendant's chronological age, but also the defendant's intelligence, maturity, and life experiences.

*State v. Walton,* 159 Ariz. at 589, 769 P.2d at 1035. Maturity is evidenced in part by the degree of the defendant's participation in the crime. *Walton,* 159 Ariz. at 589, 769 P.2d at 1035. The trial court found that defendant actually shot the deputy, and the record supports this finding. Therefore, given the degree of defendant's participation in this crime, we agree with the trial court's conclusion that defendant's age alone is not sufficiently substantial to call for leniency. *See State v. Correll,* 148 Ariz. 468, 482, 715 P.2d 721, 735 (1986) ("When age is offered as a mitigating factor, its weight may be discounted by the extent and duration of defendant's participation.").

### b. Defendant's Dysfunctional Family Background

Defendant claims that the trial court did not consider in mitigation the fact that he came from a dysfunctional family and had a father who drank a lot and beat him, his brothers, and his mother. Defendant's contention is incorrect because the trial court specifically found that defendant proved this non-statutory mitigating circumstance by a preponderance of the evidence:

> Defendant Mickel Herrera alleges that he led a depraved [sic] childhood in that his father, William Herrera, Senior, drank to excess and was physically abusive to this defendant and his brothers, as well as his mother, Dolores Herrera, the wife of William Senior.
>
> As to this allegation, the court finds that although proved by a preponderance of the evidence to exist, it does not qualify as a relevant mitigating factor under the circumstance of this murder.

In essence, the trial court simply found that this mitigating circumstance alone is not sufficiently substantial to call for leniency. We agree. Although defendant's dysfunctional family background may provide some support for a contention that defendant shot the deputy under duress, as discussed below, the simple fact that defendant led a deprived childhood, while unfortunate, does not call for leniency under the

facts of this case. *See State v. Wallace II,* 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989) (difficult family background, in and of itself, not a mitigating circumstance), *cert. denied,* 494 U.S. 1047, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990).

### c. Defendant's Employment Record and Lack of Criminal Record

■ Defendant argues that the trial judge failed to consider other evidence introduced at the sentencing hearing establishing that defendant had a good employment history and that he had no prior criminal record. We disagree.

■ The trial court, in its special verdict, stated, with regard to non-statutory mitigating factors, that it "considered each of the mitigating circumstances offered by the defendant and proved to exist by a preponderance of the evidence and [found] that they are not sufficiently substantial to outweigh the aggravating circumstances proven by the state, nor do they call for leniency." Although the trial court did not specifically enumerate defendant's employment and criminal records as considered mitigating circumstances, its general statement indicates that it considered all mitigating circumstances raised by defendant. "[W]e have never required a sentencing judge to make detailed, exhaustive findings or cite every claim or nuance advanced by defendant or his counsel in argument." *State v. McCall,* 160 Ariz. 119, 125, 770 P.2d 1165, 1171 (1989). If it is clear from the record that the trial court considered all mitigating evidence offered by defendant, due process does not require that the court document its analysis of each mitigating factor. *Clark v. Ricketts,* 958 F.2d 851, 858 (9th Cir.1991), *cert. denied,* ── U.S. ──, 113 S.Ct. 117, 121 L.Ed.2d 73 (1992).

Defendant's "work history" indicates that he has engaged in numerous manual labor jobs for short periods of time. In addition, although defendant does not have any prior felony convictions, he does have a prior juvenile DUI misdemeanor conviction. We agree with the trial court and conclude, upon our independent review of the evidence, that defendant's claims of good employment history and no prior criminal record are not mitigating circumstances sufficiently substantial to call for leniency. We find no error.

### d. Intoxication

■ At the sentencing hearing, defendant argued that his past history of alcohol and marijuana use, and his use of alcohol on the day of the deputy's murder, impaired his capacity to appreciate the wrongfulness of his conduct under A.R.S. § 13–703(G)(1). The trial court found that defendant's alcohol and drug use did not constitute a mitigating circumstance.

Although defendant has not challenged the trial court's finding on appeal, we have reviewed the record regarding defendant's alleged intoxication. We conclude that neither defendant's alcohol consumption or marijuana use prior to the date of the deputy's murder, nor defendant's alcohol consumption on the day of the deputy's murder, constitute a mitigating circumstance. The record indicates that defendant asked Ms. Cardenas to hide his beer when the deputy stopped to question the Herreras, and that defendant hid the gun he used to shoot the deputy after he fled from the crime scene. These actions indicate that defendant appreciated the wrongfulness of his conduct. *See State v. Zaragoza,* 135 Ariz. 63, 71, 659 P.2d 22, 30 (1983) (disposal of instrumentalities of crime suggest defendant appreciated the wrongfulness of his conduct). No lay testimony or expert testimony contradicts our conclusion. Therefore, we find that defendant did not prove the existence of the A.R.S. § 13–703(G)(1) mitigating circumstance by a preponderance of the evidence.

### e. Mental Impairment

At the sentencing hearing, defendant also asked the trial court to consider the results of his psychiatric evaluations as a non-statutory mitigating factor. The trial court considered this evidence and concluded that defendant's "borderline" IQ did not constitute a mitigating factor. Although defendant has not challenged the trial

court's conclusion on appeal, we have reviewed the record in an effort to determine whether defendant's alleged mental impairment constitutes a mitigating circumstance.

The psychiatrists and psychologists concluded that defendant was "in the borderline range of intellectual functioning, ... in the lowest part of the average range of intellectual functioning" although "not mentally retarded." One psychologist concluded that at the time of the murder defendant was "suffering from both alcohol abuse and depression, and that his alcohol abuse was substantial enough to have contributed to his behavior at the time of the alleged offense." Another concluded that "the contribution of this alcoholic condition to the alleged offense likely appeared in the form of impaired judgment and impulsive behavior." One of the psychiatrists who examined defendant concluded: "[S]ignificant alcoholism is present," and "his drinking lifestyle contributed to circumstances which ended in this tragedy."

### f. Duress

▇▇▇ Defendant asserts that the trial judge did not properly consider the statutory mitigating circumstance of duress. A.R.S. § 13–703(G)(2). After maintaining throughout trial that Senior committed the actual shooting, defendant now contends that he committed the murder under substantial duress because Senior, his father, ordered him to shoot the deputy. We find that defendant proved this mitigating circumstance by a preponderance of the evidence.

To satisfy § 13–703(G)(2), the defendant must be under unusual and substantial duress at the time of the crime. *State v. Rossi I*, 146 Ariz. 359, 367, 706 P.2d 371, 379 (1985). We have defined duress as "any illegal imprisonment, or legal imprisonment used for an illegal purpose, or threats of bodily or other harm, or other means amounting to or tending to coerce the will of another, and actually inducing him to do an act contrary to his free will." *State v. Wallace I*, 151 Ariz. 362, 369, 728 P.2d 232, 239 (1986), *quoting State v. Cas-*

*taneda*, 150 Ariz. 382, 394, 724 P.2d 1, 13 (1986).

The father's directions to defendant to shoot the deputy were substantial and immediate. Defendant had little opportunity to consider the consequences of his actions. We find that defendant committed murder under duress, although not such as to constitute a defense to prosecution. A.R.S. § 13–703(G)(2).

### 3. *Independent Weighing*

▇▇▇ In every capital sentencing case, after independently reviewing the existence of aggravating and mitigating circumstances, this court must weigh them against each other in order to determine whether the death penalty was properly imposed by the trial court. A.R.S. § 13–4035; *State v. Stevens*, 158 Ariz. 595, 598, 764 P.2d 724, 727 (1988); *State v. Richmond*, 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976). In so doing, we find that the mitigating circumstances in this case, taken as a whole, are sufficiently substantial to outweigh the aggravating circumstance of cruelty. The mitigating circumstances of defendant's duress, young age, and dysfunctional family background, coupled with additional evidence of his borderline IQ and drinking at the time of the incident, require leniency. We therefore reduce defendant's sentence for his first degree murder conviction from death to life imprisonment. *See State v. Jimenez*, 165 Ariz. 444, 460, 799 P.2d 785, 801 (1990).

### DISPOSITION

We have independently reviewed defendant's convictions and sentences for fundamental error pursuant to A.R.S. § 13–4035. Having found none, we affirm defendant's convictions. However, we modify the death sentence for the first degree murder conviction, reducing it from death to life imprisonment without possibility of parole for 25 years, pursuant to the provisions of A.R.S. § 13–703(A) and (E). We further affirm defendant's sentence of 10 years for aggravated robbery to be served consecutively to the murder sentence, and defendant's sentence of 21 years for kidnapping

to be served consecutively to the murder and robbery sentences.

FRANK X. GORDON, Jr., J. (Retired), concurs.

FELDMAN, Chief Justice, specially concurring.

I agree with the lead opinion's analysis and result but write separately to set forth some additional views regarding the mitigating circumstances of duress.

I believe there is mitigating value in the fact that the jury did not find that Mickel had killed with premeditation. In my view, the lack of premeditation tends to support the conclusion that Mickel reacted to and obeyed his father's command to kill. *Cf. State v. Fierro*, 166 Ariz. 539, 554, 804 P.2d 72, 87 (1991) (holding that the absence of premeditation supported conclusion that defendant killed in fear of his own life and therefore it should be weighed in mitigation).

In evaluating the issue of duress, we must also consider Mickel's background. As noted in all of the psychological reports prepared for sentencing, Mickel had an abused childhood, living with a tyrannical, violent father who ruled the family through fear. Mickel is young, immature, uneducated, has a low intelligence, and was a substance abuser at the time of the murder. Although none of these factors excuses the killing, they explain why he was likely to follow his father's commands. As stated by the Maricopa County Department of Health Services psychologist (December 22, 1988 letter to the trial judge), at the time of the killing, Mickel's mental condition (described in the report as major depression, recurrent, and alcohol intoxication) contributed to the alleged offenses "in the form of impaired judgment and impulsive behavior." Thus, Mickel's ability to resist his father's commands was significantly impaired.

Given the foregoing, I believe the evidence clearly establishes the mitigating circumstances of duress and, combined with the other factors described in the lead opinion, requires reduction of the sentence.

CORCORAN, Justice, concurring in part and dissenting in part:

I concur in this court's affirmation of defendant's convictions and robbery and kidnapping sentences. I dissent, however, from the majority's reduction of defendant's first degree murder sentence because I do not agree that defendant proved the existence of the mitigating circumstance of duress. Nor do I believe that the remaining mitigating circumstances outweigh the aggravating circumstance of cruelty.

As stated by the majority, the § 13–703(G)(2) mitigating circumstance is established only if a defendant is under *unusual and substantial* duress at the time of his crime. *See State v. Rossi I*, 146 Ariz. 359, 367, 706 P.2d 371, 379 (1985). Although the record establishes that Senior often beat his children when he was drunk, it also indicates that these beatings occurred when defendant and his brothers were young and their mother was still living with Senior. For example, Ms. Cardenas testified that both defendant and Senior told her that Senior beat his children when they were *young*. Dolores Herrera testified that she left Senior and moved to Texas from Phoenix because Senior beat her and her children when he was drunk. Defendant moved to Texas to live with his mother when he was about 10 or 12 years old. Although he occasionally lived with Senior in the interim, defendant did not move back to Phoenix and live with Senior permanently until April of 1988—two months before the deputy's murder. There is no evidence that Senior beat defendant during that time.

I believe, therefore, that the balance of the evidence does not indicate that defendant committed murder under unusual and substantial duress, nor does it indicate that Senior coerced defendant into committing an act *contrary to his free will*. *See Wallace I*, 151 Ariz. at 369–70, 728 P.2d at 239–40. Defendant did not prove the existence of the A.R.S. § 13–703(G)(2) mitigating circumstance by a preponderance of the evidence.

Furthermore, when balancing the aggravating and mitigating circumstances, the majority considers the effect of defendant's alcohol consumption on the day of the murder, as well as defendant's "borderline" I.Q. However, these factors should not be considered as mitigating circumstances. There is no evidence in the record that defendant was intoxicated when he shot Deputy Marconnet, and significant evidence indicates that defendant both appreciated the wrongfulness of his conduct and could conform his conduct to the requirements of the law. In addition, the only evidence tending to support a conclusion of mental impairment is that defendant has a "borderline" I.Q. The majority, therefore, bases its intoxication and mental impairment considerations on mere conjecture.

Finally, with respect to the majority's citation of *State v. Jimenez*, 165 Ariz. 444, 799 P.2d 785 (1990), this case is easily distinguished from *Jimenez*. The *Jimenez* court reduced the defendant's death sentence to life imprisonment because of "the severity of defendant's mental illness, combined with the substantial and relevant factor of defendant's young age [17 years, 2 months] and borderline intelligence level affecting his intellectual maturity...." 165 Ariz. at 460, 799 P.2d at 801. In so doing, the court explicitly affirmed the trial court's finding that the defendant's "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired at the time of the offense...." *Jimenez*, 165 Ariz. at 456, 799 P.2d at 797. This finding was supported by evidence provided by no fewer than *9* expert witnesses, whose diagnoses ranged from schizotypal personality to "the paranoid schizophrenic with borderline intelligence who hears command voices and had no mental capacity at all to commit this crime." *Id.* In addition, there was expert testimony that the defendant was functioning in the "borderline range of intelligence." The only similarity between defendant and Jimenez is that they both have "borderline"

intelligence. Thus, *Jimenez* provides no support for the majority's conclusion.

Because no evidence in the record supports the majority's duress finding, or its consideration of intoxication and mental impairment in its aggravation/mitigation balancing, I would affirm the defendant's death sentence. The existing mitigation does not outweigh the severe physical abuse and emotional anguish suffered by the deputy at the hands of defendant and his family.

MOELLER, V.C.J., concurs.

NOTE: Justices THOMAS A. ZLAKET and FREDERICK J. MARTONE did not participate in the determination of this matter.