NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

CLARK LEE WYLIE, *Appellant.*

No. 1 CA-CR 19-0207
FILED 8-13-2020

Appeal from the Superior Court in Maricopa County
No. CR2017-006288-003
The Honorable Michael W. Kemp, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Brian Coffman
*Counsel for Appellee*

Maricopa County Legal Defender's Office, Phoenix
By Cynthia D. Beck
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Samuel A. Thumma and Judge Peter B. Swann joined.

---

**H O W E,** Judge:

¶1         Clark Lee Wylie appeals his convictions and sentences for first-degree murder, first-degree burglary, conspiracy to commit first-degree burglary, and disorderly conduct. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2         We view the facts in the light most favorable to sustaining the verdicts and resolve all reasonable inferences against Wylie. *See State v. Payne*, 233 Ariz. 484, 509 ¶ 93 (2013). Victim C.C. started dating co-defendant Tiffany Van Nest in October 2016 while they were living in Texas. **C.C. and Van Nest** moved in together after a few months along with Van Nest's infant son, K.N. Wylie is K.N.'s father.

¶3         C.C., Van Nest, and K.N. moved to Arizona in March 2017. In mid-May 2017, C.C. and Van Nest got into a heated argument, and C.C. assaulted Van Nest, knocking out a tooth. C.C. later assaulted Van Nest again and hit K.N., causing them each injuries. When Van Nest told Wylie about the incident, he became enraged. Van Nest and K.N. soon returned to Texas and visited Wylie.

¶4         The day after that visit in Texas, Wylie and Van Nest drove back to Arizona to confront C.C. Wylie brought two baseball bats, and they picked up Wylie's friend, Jesus Gomez (referred to at times at trial as "Killa") for assistance. During the trip, they discussed attacking C.C.

¶5         The three went to C.C.'s apartment. Wylie and Gomez walked to the door with the baseball bats and knocked. After C.C. opened the door, Wylie and Gomez "rushed in" and attacked C.C., hitting him with the bats repeatedly. C.C. attempted to defend himself with a golf club.

¶6         The fighting woke up C.C.'s younger brother, twelve-year-old A.C. A.C. entered the living room where the attack was happening and saw Wylie and Gomez standing over C.C., who was face down and

"gurgling blood." Wylie and Gomez then fled with Van Nest. C.C. died from blunt force trauma to the head. After they were arrested in Texas, Wylie told Van Nest and Gomez that they should not have taken their phones because "that's how they got us."

¶7　　　　The State charged Wylie with first-degree murder, first-degree burglary, conspiracy to commit first-degree burglary, and disorderly conduct. Van Nest entered a testimonial plea agreement with the State and testified at trial.

¶8　　　　Wylie did not dispute the primary facts at trial, and his "*only* defense was that he did not premeditate the murder and he did not commit a burglary that resulted in C.C.'s death." Wylie's defense focused significantly on Van Nest's role and her credibility. In opening statement, Wylie's counsel told the jury:

> [B]ut for [Van Nest] we all wouldn't be here in this case. We all wouldn't—this trial wouldn't have happened. These charges wouldn't have happened. It's all about Tiffany Van Nest and her maneuvering and manipulating all of the individuals in this case, including the State of Arizona. And I will submit to you that the State of Arizona cut a deal with the devil[.]

When concluding her opening statement, Wylie's counsel described Van Nest as a "femme fatale" and repeated her assertion that the State made a "deal with the devil."

¶9　　　　Defense counsel began her closing argument by stating, "At the end of my argument this afternoon to you, I'm going to ask you to consider finding [Wylie] guilty of something lesser than first-degree murder." Defense counsel concluded her closing argument as indicated:

> I'm asking you not to buy that house for Murder 1. I'm asking you to consider second-degree murder or more appropriately, a manslaughter charge, because that is what this was. . . . I'm asking you to give him the benefit of the doubt in this case. I'm not asking you to set him free. I'm not saying that he doesn't deserve to be punished. I'm just asking you to consider less than Murder 1 in this case. This is not a first-degree murder case. This is a case of heat of passion. This is a case that got completely out of control. And again, but for the femme fatale, we all wouldn't be here.

¶10       After a 13-day trial, the jury convicted Wylie as charged. The trial court sentenced Wylie to concurrent terms of natural life with the possibility of release after 25 years for first-degree murder; 20 years' imprisonment for first-degree burglary; and 20 years' imprisonment for conspiracy to commit first-degree burglary. The trial court imposed a consecutive sentence of 5.75 years' imprisonment for disorderly conduct. Wylie timely appealed.

## DISCUSSION

### 1. Alleged Prosecutorial Misconduct

¶11       Wylie claims that the prosecutor committed misconduct during his closing argument by "pandering" and "impugning defense counsel." Wylie urges that the cumulative effect of the prosecutor's statements denied him a fair trial. We address each of the individual allegations of misconduct and their cumulative effect below.

¶12       We initially examine each instance of alleged misconduct to determine if the defendant has established error. *State v. Goudeau*, 239 Ariz. 421, 465 ¶ 192 (2016). Our standard of review depends on whether Wylie objected to the individual allegations. *State v. Morris*, 215 Ariz. 324, 335 ¶ 47 (2007). "When a defendant objects to an alleged act of prosecutorial misconduct, we review the issue for harmless error; when a defendant fails to object, we engage in fundamental error review." *State v. Dann*, 220 Ariz. 351, 373 ¶ 125 (2009).

¶13       "Prosecutorial misconduct 'is not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial.'" *State v. Aguilar*, 217 Ariz. 235, 238–39 ¶ 11 (App. 2007) (quoting *Pool v. Superior Court*, 139 Ariz. 98, 108–09 (1984)). "After reviewing each incident for error, we must assess whether the incident should count towards [the] prosecutorial misconduct claim[,]" and we then evaluate the cumulative effect of the incidents on the trial. *State v. Roque*, 213 Ariz. 193, 228 ¶ 155 (2006) (quotations and citations omitted). The defendant "must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at ¶ 152 (quotations and citations omitted).

¶14       "[D]uring closing arguments counsel may summarize the evidence, make submittals to the jury, urge the jury to draw reasonable

inferences from the evidence, and suggest ultimate conclusions." *State v. Bible*, 175 Ariz. 549, 602 (1993). To determine whether a prosecutor's remarks during closing argument were improper, we examine whether the remarks call the jury's attention to matters that they should not consider for their verdict and the probability, under the circumstances, that the remarks influenced the jurors. *State v. Jones*, 197 Ariz. 290, 305, ¶ 37 (2000) (quotation omitted). In making that determination, we look at the context of the comments and examine the entire record and totality of the circumstances. *State v. Rutledge*, 205 Ariz. 7, 13, ¶ 33 (2003) (citations omitted).

### a. Pandering

**¶15** Wylie argues that the prosecutor made the following statements intending to "inflame the passions and fears of the jury:"(1) that A.C. "was made to experience what no 12 year old should ever have to experience," watching Wylie and Gomez "beat his brother to death with baseball bats;" (2) C.C.'s apartment was "his home, his sanctuary;"(3) the jurors are "wards of justice," urging that "justice demands" a guilty verdict; and (4) jurors should "envision yourself" when hearing a "clamor at the door," which Wylie argues asked the jurors to "put themselves in the shoes of the victim." Wylie concedes that he made no objections, meaning we review for fundamental, prejudicial error. *State v. Escalante*, 245 Ariz. 135, 142 ¶ 21 (2018) (citation omitted).

**¶16** "Prosecutors have 'wide latitude' in presenting their arguments to the jury" and may argue all reasonable inferences from the evidence. *Morris*, 215 Ariz. at 336 ¶ 51 (2007) (quotation omitted). A prosecutor exceeds that authority by using remarks that "inflame the minds of jurors with passion or prejudice or influence the verdict in any degree." *Goudeau*, 239 Ariz. at 468, ¶ 210 (quotation omitted).

**¶17** The prosecutor's statements about A.C. accurately summarized the evidence that A.C. witnessed C.C.'s murder and was "screaming," "hysterical" and "going into shock" because of it. The prosecutor's comments also reflect argument that Wylie's actions disturbed A.C.'s peace, which is an element of disorderly conduct. *See* A.R.S. 13-2904(A)(1) (defining disorderly conduct, which includes showing that a defendant knowingly or intentionally disturbed a person's peace). We see nothing inflammatory in the brief description and find no misconduct. *See Jones*, 197 Ariz. at 305, ¶ 37; *State v. Zaragoza*, 135 Ariz. 63, 68 (1983) ("Some amount of emotion in closing argument is not only permissible, it is to be expected.").

¶18 For similar reasons, the prosecutor did not engage in misconduct by describing C.C.'s apartment as his "home" and "sanctuary" on two isolated occasions. The prosecutor first used the terms while arguing that the jury should consider where the attack happened to assess whether Wylie's "conduct was privileged under the law of self[-]defense." The prosecutor asked the jury to consider that Wylie drove "some 450 miles" before arriving at the victim's "home, to his sanctuary." He continued, "This defendant created the situation which called for [violence]. He put himself in this victim's apartment. When you create a situation that requires you to use deadly force by committing a crime, you do not get to claim self[-]defense." The second use of "sanctuary" occurred at the end of the prosecutor's closing argument: "They cross the line into this victim's residence, his sanctuary, and they beat him to death with no less than three blows to the head and many more to his body."

¶19 The terms "home" and "sanctuary" did not "improperly appeal to the jurors' emotions, passions or prejudices by urging them to convict [Wylie] for reasons wholly irrelevant to his own guilt or innocence." *State v. Herrera*, 174 Ariz. 387, 397 (1993). The references, first, were relevant to the residential element of first-degree burglary and, therefore, felony murder. *See* A.R.S. § 13-1508(B) (proving first-degree burglary requires showing that a defendant "entered or remained unlawfully in a residential structure"); A.R.S. § 13-1105(A)(1) (proving felony murder requires showing that a defendant caused a person's death during the commission of an enumerated felony such as burglary). The prosecutor's remarks also aimed at explaining why Wylie's actions showed he was guilty of premeditated murder as opposed to manslaughter resulting from adequate provocation, arguing that Wylie "can't break into the house and claim self-defense. And [Wylie] can't claim adequate provocation to justify his actions."

¶20 Wylie further challenges the prosecutor's two remarks mentioning "justice." The first instance occurred while the prosecutor was discussing reasonable doubt and he stated, "This is a straightforward case, and you have a serious job to do. You are the wards of justice in the death of a 20 year old." The second instance came in the prosecutor's final statement of his closing argument: "[T]he State is asking you to find that the evidence compels and the [sic] justice demands, to find this defendant guilty of all Counts."

¶21 Viewed in context, the prosecutor's "wards of justice" comment permissibly referred to the jury's role and duty. *See State v. Acuna Valenzuela*, 245 Ariz. 197, 222–23 ¶ 111 (2018) (holding that discussing the

jury's role in the justice system is not error within the proper context); *Herrera*, 174 Ariz. at 396 (finding no misconduct in a prosecutor's statements that "if the [S]tate has met its burden and the law does apply, then you do your duty so a civilized society can keep going" because the "duty" was to convict if the State met its burden). Similarly, the prosecutor's submission to the jury to do "what justice demands" summarized the State's argument that the evidence proved Wylie was guilty of first-degree murder, not a lesser offense. *See Goudeau*, 239 Ariz. at 468 ¶¶ 210–11 (finding no misconduct when the prosecutor told the jury that "[w]e are seeking a just punishment for what this defendant has done"); *see also Jones*, 197 Ariz. at 307 ¶ 43 (concluding that the prosecutor's request for the jury to find defendant "guilty on behalf of those people and their families and the people of the State of Arizona" was not misconduct).

**¶22** Finally, the prosecutor did not ask the jurors "to place themselves in the shoes of the victim" in his "envision yourself" comment:

> You have to remember, not only is [C.C.] defending his home, his own health, but he has a 12 year old brother in the room next door. I want you to envision yourself when is the last time you heard a bump in the night, heard clamor, identified clamor at the door? How did you react? How did you respond? [C.C] had almost no time to react to what was coming through his door, while these defendants, this defendant had all the time in the world. How much time exactly? It depends on when you start the clock for Clark Wylie. There are a few major points for reflection that we can retrace to the defendant's path to this murder.

The prosecutor invited the jurors to use a personal experience as a point of reference to understand C.C.'s reaction time. The prosecutor did not, however, ask the jurors to consider how each would react being in C.C.'s place when he saw Wylie and Gomez with baseball bats at his door. *Cf. Morris*, 215 Ariz. at 337 ¶¶ 57–60 & n.6 (holding that a prosecutor's comments constituted misconduct, but not fundamental error, when the prosecutor asked which jurors wanted to "volunteer . . . by a show of hands" to be a victim and describing the facts in detail). In context, the prosecutor's argument here again explained why Wylie's actions were premeditated; that Wylie was the unprovoked aggressor; and that C.C.'s retaliation was justified. The statement was not improper. *See Herrera*, 174 Ariz. at 397.

### b. Impugning Defense Counsel

¶23 Wylie also contends that the prosecutor impugned defense counsel's integrity during closing argument. Specifically, Wyle identifies the following comments as misconduct: (1) arguing that defense counsel "overinflate[d]" or "overemphasize[d]" Van Nest's role; (2) asking the jury not to be "distracted" by defense counsel's arguments, referring to them as "smoke and mirrors"; (3) stating that "defense counsel can't seem to pick a lane" because she was hoping that the jury would "pick whichever one gets her client off"; and (4) arguing that "defense is asking you to split the baby." Generally, Wylie argues that the prosecutor committed misconduct by referring to defense counsel directly (by "defense counsel" or a pronoun) instead of Wylie's theories and tactics.

¶24 Wylie objected to two of these statements. Both occurred during rebuttal argument. After the prosecutor remarked that defense counsel sought to "get her client off," defense counsel interjected, "I'm going to object." Following the "smoke and mirrors" comment, defense counsel objected, "This is improper." Wylie did not provide a ground or argument for either objection. The trial court overruled the first objection on the basis that defense counsel argued Wylie was "guilty of a lesser-included." The trial court instructed the prosecutor to rephrase after the second objection but did not give a ruling.

¶25 A proper objection requires "states the specific ground, unless it was apparent from the context." Ariz. R. Evid. 103(a)(1)(B) A general objection or an objection on a ground other than the one asserted on appeal does not preserve the issue. *Id.* Fundamental error review applies when a defendant fails to object properly to the trial court. *Id.* Because Wylie's unspecified objections did not sufficiently preserve his claims of prosecutorial misconduct, we review for fundamental, prejudicial error. *Dann*, 220 Ariz. at 373 ¶ 125. Assuming *arguendo* that Wylie's objections asserted prosecutorial misconduct, we review for harmless error. *Id.* "Regardless of how an alleged error ultimately is characterized, however, a defendant on appeal must first establish that some error occurred." *State v. Diaz*, 223 Ariz. 358, 360 ¶ 11 (2010).

¶26 None of the challenged remarks constitute error, fundamental or otherwise. "While commentary about the defense's theory is common, [a]n argument that impugns the integrity or honesty of opposing counsel is . . . improper." *State v. Hulsey*, 243 Ariz. 367, 390 ¶ 99 (2018) (quotation omitted). The prosecutor's "smoke and mirrors," "split the baby," "pick a lane," and "whichever gets her client off" statements all occurred during

rebuttal argument and directly responded to Wylie's arguments that "[Wylie] was guilty of manslaughter or second-degree murder" and "the femme fatal[e], set [Wylie] up for a surprise murder." *See State v. Gillies*, 135 Ariz. 500, 510–11 (1983) (stating that a prosecutor may present "fair rebuttal to an area opened by defense"). The remaining comments occurred during the State's initial argument and criticized Wylie's tactics during trial blaming Van Nest. *See State v. Ramos*, 235 Ariz. 230, 237-38 ¶¶ 24–25 (App. 2014) (finding no error from a prosecutor's comments that defense counsel's arguments were distractions or "red herrings" because prosecutors may criticize "defense theories and tactics") (quotation omitted). None of the challenged remarks contain any personal attack, derogatory language, or accusation directed at defense counsel. *See Hulsey*, 243 Ariz. at 390 ¶ 99 (finding that a prosecutor's comments equating defense counsel to Don Quixote improperly impugned counsel's integrity)*; compare State v. Amaya-Ruiz*, 166 Ariz. 152, 171–72 (1990) (finding a prosecutor's comments that defense counsel "blind sided witnesses," used "innuendo and inference," made an "outrageous" argument, and accused witnesses were "not improper . . . and certainly did not rise to the level of fundamental error"), *with State v. Hughes*, 193 Ariz. 72, 86 ¶ 61 (1998) (finding misconduct for a prosecutor's remarks that defense counsel and experts "fabricated" an insanity defense without supporting evidence).

¶27 We are also not persuaded by Wylie's claim that the prosecutor's direct references to defense counsel were implicit *ad hominem* attacks on her integrity. *See Hulsey*, 243 Ariz. at 390, ¶ 99. Viewed in context and as illustrated *supra* ¶¶ 9–10, the record reveals that throughout opening statement and closing argument, defense counsel consistently presented Wylie's defense using a first-person narrative form (e.g., "I ask," "I submit," "I think," and "I told"). The prosecutor's references to defense counsel proportionately reflected the form through which counsel presented the defense's theories, and we do not find that it rose to the level of misconduct. *See Acuna Valenzuela*, 245 Ariz. at 221 ¶¶ 99–100.

### c. Cumulative Effect

¶28 Wylie argues that the cumulative effect of the prosecutor's comments deprived him of a fair trial. Determining that none of the comments were improper, we further find no cumulative effect of misconduct. *State v. Bocharski*, 218 Ariz. 476, 492 ¶ 75 (2008) ("Absent any finding of misconduct, there can be no cumulative effect of misconduct sufficient to permeate the entire atmosphere of the trial with unfairness."). Additionally, the trial court instructed the jury that lawyers' comments are not evidence, and we presume jurors follow the court's instructions. *Morris*,

215 Ariz. at 336–37 ¶ 55. Assuming any comments were improper, the trial court's instructions "negated their effect," and no prejudice resulted. *Id.*

## 2. Alleged Sentencing Error

¶29 Wylie argues that the "trial court erred by finding aggravating factors and imposing an aggravated sentence" for the disorderly conduct conviction because no aggravators were proven to the jury. Because Wylie did not object to the sentence, we review his claim for fundamental, prejudicial error. *Escalante*, 245 Ariz. at 142 ¶ 21. An illegal sentence is fundamental error. *See State v. Cox*, 201 Ariz. 464, 468, ¶ 13 (App. 2002).

¶30 The trial court sentenced Wylie, a category 3 repetitive offender, to the aggravated term of 5.75 years for disorderly conduct, the longest possible sentence for such a conviction. A sentence to the aggravated term requires at least two aggravators to be found under A.R.S. § 13-701(D), and a jury must find at least one aggravator for any sentence exceeding the maximum term, A.R.S. §§ 13–701(F), –703(K); *Blakely v. Washington*, 542 U.S. 296, 301 (2004). Wylie stipulated to five prior felony convictions, thereby providing one permissible aggravator under A.R.S. § 13-701(D)(11), but the State did not prove any aggravators to the jury. Despite the absence of a jury finding, the trial court found additional aggravating factors, including the presence of accomplices, A.C.'s age, and the "trauma" A.C. suffered. The State concedes that the trial court fundamentally erred but argues that the error was not prejudicial. We agree with the State.

¶31 "*Blakely* error . . . can be harmless if no reasonable jury, on the basis of the evidence before it, could have failed to find [the factors] . . . necessary to expose the defendant to the sentence imposed." *State v. Hampton*, 213 Ariz. 167, 183 ¶ 72 (2006) (citation omitted). Here, no reasonable jury could have failed to find the presence of Wylie's accomplices (namely, Gomez and Van Nest). *See* A.R.S. §§ 13–701(D)(4), –301 (defining accomplice). Likewise, no reasonable jury could have failed to find that Wylie caused A.C. emotional harm. *See* A.R.S. § 13–701(D)(9). Wylie did not dispute the underlying facts at trial concerning the presence of accomplices or A.C.'s traumatic experience. And Wylie does not argue on appeal that a reasonable jury could have failed to find either factor. Accordingly, Wylie has not satisfied his burden to establish prejudice. *See Escalante*, 245 Ariz. at 142 ¶ 21.

## CONCLUSION

¶32        For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:   AA