NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

STATE OF ARIZONA, *Appellee,*

*v.*

CHRISTOPHER ALONZO, *Appellant.*

No. 1 CA-CR 14-0029
FILED 11-13-2014

---

Appeal from the Superior Court in Maricopa County
No. CR2013–103283-001
The Honorable Daniel J. Kiley, Judge

**AFFIRMED**

---

COUNSEL

Office of the Attorney General, Phoenix
By Craig W. Soland
*Counsel for Appellee*

Office of the Legal Defender, Phoenix
By Cynthia D. Beck
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Patricia A. Orozco and Judge Maurice Portley joined.

---

H O W E, Judge:

¶1          Christopher Alonzo appeals from his convictions and sentences imposed for one count each of armed robbery, kidnapping, and theft of means of transportation. Alonzo argues that the State improperly commented on his post-*Miranda*[1] right to remain silent and engaged in other misconduct. On those bases, Alonzo contends that the trial court should have granted his motions for a mistrial and a new trial. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY[2]**

¶2          A.G. was driving his Chevrolet Tahoe when he stopped at an intersection. Alonzo and another individual brandishing handguns entered A.G.'s vehicle, pointed their weapons at him, and directed A.G. to drive to a park. A.G. complied.

¶3          Upon arriving at the park, Alonzo got out of the Tahoe and approached the driver's side. Alonzo and other armed individuals at the park took "everything" from A.G., including his wallet and wedding ring. They ordered A.G. to leave the park on foot. He did so, and then contacted the police. A.G. had never seen Alonzo before this incident.

¶4          Police found A.G.'s abandoned Tahoe near the park. They found Alonzo's fingerprints on the vehicle's exterior windshield near the driver's side door, and A.G. subsequently identified Alonzo in a photographic line-up.

¶5          Detective Dominguez then interviewed Alonzo, who was in custody at the Department of Corrections on an unrelated charge. Dominguez read Alonzo his *Miranda* rights, and "Alonzo agreed to give up

---

[1]     *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2]     We review the facts in the light most favorable to sustaining the verdicts. *See State v. Guerra,* 161 Ariz. 289, 293, 778 P.2d 1185, 1189 (1989).

those rights and speak with [the detective]." Dominguez informed Alonzo that he wanted to discuss the robbery incident involving A.G. Alonzo stated that he "didn't know what [Dominguez] was talking about[,]" and Alonzo denied ever having touched or driven a Chevrolet Tahoe. When Detective Dominguez informed Alonzo that his fingerprints had been discovered on A.G.'s vehicle, Alonzo admitted to having driven a friend's Tahoe that matched the description of A.G.'s a few days before the robbery incident. Alonzo continued, however, to deny involvement in the armed robbery. After the interview ended, Alonzo never contacted Detective Dominguez to provide an alternative explanation for the presence of his fingerprints on A.G.'s vehicle.

¶6        Approximately six weeks later, the State charged Alonzo with one count each of armed robbery, a class two dangerous felony (Count 1); kidnapping, a class two dangerous felony (Count 2); and theft of means of transportation, a class three felony (Count 3).

¶7        At trial, Alonzo testified he had met A.G. two or three days before the robbery incident. Specifically, Alonzo explained that as he was waiting for a bus at the same location where A.G. was kidnapped, A.G. approached in his Tahoe and beckoned Alonzo to the vehicle. Alonzo testified he walked up to A.G., leaned against the driver side door with his hand "right there by the door and by the window[,]" and A.G. asked whether Alonzo knew "where to get some coke." Alonzo said, "No," and A.G. left. Alonzo also testified that he has three prior felony convictions.

¶8        During Alonzo's cross-examination, the following transpired:

> Q: Okay. This information that you're telling the jury this afternoon, do you think that would be important for the police to have known prior to today?
>
> A: Yes, sir.
>
> Q: And yet you never made any effort to communicate this information with the police?
>
> A. I didn't know nothing about this case.
>
> . . . .
>
> Q: Okay. Well, you've had access to the police report for how long now?

A: Since March.

Q: March. Okay. So for several months?

A: Yes, sir.

. . . .

Q. And so you know the information it contains?

A. Yes, sir.

Q. And indeed you have reviewed the police report that Detective Dominguez testified to this afternoon?

A. Yes, sir.

Q. That he authored?

A. Yes, sir.

Q. And so you're well aware since March presumably that none of this information that you're presenting to the jury here today is contained in Detective Dominguez's report?

A. I don't get what you're saying.

Q. Okay. Well, you testified a moment ago that you have had an opportunity to read his report and the police reports in this case?

A. Yes, sir.

Q. So all this information that you're telling the jury today, none of it appears in any of those reports?

A. Yes, sir.

Q. So even though you have had prior contact with Detective Dominguez, you have had multiple contacts with the criminal justice system, you're coming forth for the first time today and telling us now a third version of what happened?

A. Officer Dominguez never told me nothing about this case.

Q. Fair enough. But you know what Detective Dominguez has written in his police report?

A. That's his testimony. That's what he writes in his police report.

Q. Okay. And granted, if that's the case, when you read that report, didn't you become concerned and think, gee, there's more information I need to provide him because he doesn't have it all?

¶9 Alonzo objected, arguing that the questions were impermissible comments on his right to remain silent. The trial court overruled the objection and denied Alonzo's contemporaneous motion for a mistrial.

¶10 In its rebuttal case, and without objection, the State elicited the following from Detective Dominguez:

Q. And you heard [Alonzo's] testimony about a prior encounter with the victim at the same location at 19th Avenue and Desert Cove?

A. Correct.

Q. Is that the first time you had been provided with that information?

A. Yes.

Q. He never mentioned anything of that sort during your prior interview with him?

A. No.

. . . .

Q. And it's fair to say nothing that [Alonzo] told you when you interviewed him in November—or excuse me—when you interviewed him in custody indicated that there had been prior contact between him and the victim—

A. No.

Q. -- prior to the day the car was taken?

A. Correct. He didn't say anything.

**¶11** In rebuttal closing argument, and again without objection, the prosecutor stated: "[T]he defendant takes the stand and tells you version number three, shaking up the chess table again, about this drug transaction, that he never mentioned to the detective, which is the first thing an innocent person would bring up, if they [sic] were interviewed." The prosecutor also challenged the persuasiveness of defense counsel's closing arguments.

**¶12** The jury returned guilty verdicts on all counts as charged. The jury also found that the State proved the following aggravating factors: presence of an accomplice, harm to the victim, and infliction or threatened infliction of serious physical injury. Based on these findings and the court's determination that the State sufficiently proved Alonzo's prior felony convictions, the court imposed partially aggravated concurrent prison terms of 16 years for Counts 1 and 2, and 12 years for Count 3.

**¶13** Alonzo moved for a new trial, arguing that the prosecutor's questioning of Alonzo and statements made during closing argument constituted misconduct. The trial court denied the motion.

## DISCUSSION

**¶14** In arguing that the trial court erred in denying his motions for a mistrial and a new trial, Alonzo specifically contends that the prosecutor deliberately engaged in prejudicial misconduct during Alonzo's cross-examination and in closing arguments by referring to Alonzo's post-*Miranda* silence. Alonzo also argues that the prosecutor committed misconduct by impugning defense counsel during closing arguments. Alonzo asserts that the cumulative effect of the misconduct requires reversal.

**¶15** To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that "(1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying defendant a fair trial." *State v. Moody*, 208 Ariz. 424, 459 ¶ 145, 94 P.3d 1119, 1154 (2004). Prosecutorial misconduct is not merely "legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial." *Pool v. Superior Court*, 139 Ariz. 98, 108-09, 677 P.2d 261, 271–72 (1984). To justify reversal, the misconduct "must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *State v. Lee*, 189 Ariz. 608, 616, 944 P.2d 1222, 1230 (1997) (citation omitted). Even then, reversal is not required unless the

defendant was denied a fair trial. *State v. Bible*, 175 Ariz. 549, 600, 858 P.2d 1152, 1203 (1993). In short, our "focus is on the fairness of the trial, not the culpability of the prosecutor." *Id.* at 601, 858 P.2d at 1204.

**¶16**　　　　When considering a motion for a mistrial based on prosecutorial misconduct, a trial court should first consider whether the prosecutor's statements called jurors' attention to matters the jury was not justified in considering to determine its verdict.　*Lee*, 189 Ariz. at 616, 944 P.2d at 1230. Further, as long as closing argument is based on evidence presented and reasonable inferences therefrom, counsel may "suggest ultimate conclusions." *Bible,* 175 Ariz. at 602, 858 P.2d at 1205.　Accordingly, we first address whether the State improperly questioned Alonzo about his post-*Miranda* silence.

I.　　　**Post-*Miranda* Silence**

**¶17**　　　　In a criminal prosecution, the State may not refer to the defendant's decision to remain silent after receiving *Miranda* warnings. *State v. Guerra*, 161 Ariz. 289, 296, 778 P.2d 1185, 1192 (1989) (citing *Doyle v. Ohio*, 426 U.S. 610, 619 (1976)). A defendant who voluntarily speaks post-*Miranda*, however, is not entitled to this constitutional protection. *Id.* "If a defendant tells different stories during post-arrest questioning and at trial, the prosecution may properly inquire into the prior inconsistent statements, even though the prior statements involve 'silence' insofar as they omit facts contained in the later story."　*Id*.

**¶18**　　　　In *State v. Stuck*, 154 Ariz. 16, 739 P.2d 1333 (App. 1987), this Court addressed whether the State committed fundamental error in closing arguments by asserting that the defendant, who was charged with sexual assault, waited until trial to explain the victim consented to sexual conduct with him.　The challenged arguments in that case included:

> [The defendant] has had access to the victim's tape recorded interview. He sat through and listened through everyone's testimony. He had five months before he ever told you anything about this alternate bondage defense . . . . Then the defendant started getting this—all this evidence, so that now after five months, now it's consent and she consented to bondage.

*Stuck*, 154 Ariz. at 21, 739 P.2d at 1338.

**¶19**　　　　This Court rejected the appellant's argument that the statements improperly commented on the defendant's post-arrest silence

noting that in cases where a defendant voluntarily makes post-*Miranda* statements and testifies to a "directly exculpatory version of the facts[]" at trial, those prior statements may be used to impeach the defendant's credibility. *Id.* Additionally, we held that the defendant's five months of silence between the time he made the statements to police and his trial testimony did not amount to an invocation of his right to silence. *Id.* at 22, 739 P.2d at 1339. Concluding no error occurred, we reasoned:

> [T]he prosecutor was not attacking appellant's silence, but rather his fourth version of the events which he testified to at trial. He was merely commenting on how the fourth story attempted to include all the facts which emerged during the discovery process. The prosecutor's tactic, in view of appellant's first three statements, was a permissible attack on appellant's testimony at trial, not a comment on any "silence" on appellant's part.

*Id.* We find *Stuck* dispositive.

¶20        Alonzo does not dispute that he did not invoke his right to remain silent during his interview with Detective Dominguez. Instead, after being informed of his right to remain silent, Alonzo waived this right by initially denying any involvement with A.G.'s vehicle. *See State v. Trostle,* 191 Ariz. 4, 14, 951 P.2d 869, 879 (1997) ("Answering questions after police properly give the Miranda warnings constitutes waiver by conduct."). And after learning of his fingerprint, Alonzo continued to speak, explaining that he had borrowed a friend's Tahoe. Therefore, the prosecutor's comments regarding inconsistencies between the statements Alonzo made during his police interview and Alonzo's trial testimony were not improper. Alonzo simply was not silent. Accordingly, no *Doyle* error occurred, and the prosecutor did not engage in misconduct on this basis. *See State v. Tuzon,* 118 Ariz. 205, 207, 575 P.2d 1231, 1233 (1978) ("When one who has voluntarily made statements to police officers after his arrest makes new exculpatory statements at trial, the fact that he failed to make these statements earlier may be used for impeachment.").

¶21        Alonzo also argues that the prosecutor's questions regarding Alonzo's post-*Miranda* silence improperly implied that Alonzo had an obligation before trial to provide law enforcement with the exculpatory testimony Alonzo offered at trial.

¶22        We disagree. The prosecutor's questions did not imply that Alonzo was obligated before trial to provide the State with the exculpatory

version of events that he testified to at trial. Rather, the jury was properly instructed that Alonzo was "not required to produce evidence of any kind." By providing at trial an exculpatory explanation for the presence of his fingerprints on A.G.'s vehicle that differed from his explanation at the interview, Alonzo, as he properly concedes, made his credibility at trial the central issue as to his guilt or innocence. *See State v. Anderson*, 110 Ariz. 238, 241, 517 P.2d 508, 511 (1973) ("When a defendant makes a statement at trial which is inconsistent with an earlier statement[,] his credibility is clearly in question."). Alonzo's pre-trial silence after the interview was highly probative on this issue. Moreover, the record reflects the prosecutor did not argue that Alonzo should be found guilty because of his post-interview and pre-trial silence; instead, he argued the jury should disbelieve Alonzo's trial testimony. The prosecutor's comments, therefore, were not impermissibly geared toward either Alonzo's right to remain silent or his obligation to provide evidence. *See Stuck*, 154 Ariz. at 22, 739 P.2d at 1339. In accord with *Stuck*, we conclude that no misconduct occurred on this basis. And because we find no misconduct, we need not address the State's contention that we are constrained to fundamental error review on this issue. *See State v. Lavers*, 168 Ariz. 376, 385, 814 P.2d 333, 342, (1991) ("Before we may engage in a fundamental error analysis, however, we must first find that the trial court committed some error.").

## II.  **Closing Arguments**

**¶23**      Alonzo contends that the prosecutor engaged in misconduct by arguing an innocent person would have told Detective Dominguez the exculpatory story that Alonzo testified to at trial. We disagree. Because Alonzo had not invoked his right to remain silent at the police interview and we determine the prosecutor's cross-examination of Alonzo did not constitute *Doyle* error or misconduct, we cannot conclude this argument was improper. Rather, the argument was a proper comment on, and inference from, Alonzo's testimony. *See Bible,* 175 Ariz. at 602, 858 P.2d at 1205 ("[D]uring closing arguments counsel may summarize the evidence, make submittals to the jury, urge the jury to draw reasonable inferences from the evidence, and suggest ultimate conclusions."); *see also State v. Raffaele*, 113 Ariz. 259, 262, 550 P.2d 1060, 1064 (1976) (holding that a prosecutor's statements during closing argument regarding defendant's post-*Miranda* failure to give police the exculpatory explanation of criminal conduct that defendant testified to at trial "were permissible comment[s] on the creditability of the accused by comparing his court testimony with his earlier out-of-court statements").

¶24 Alonzo also contends that the State's rebuttal closing argument improperly impugned defense counsel's integrity. Specifically, Alonzo points to the prosecutor's following statements:

> I am one of these odd individuals who likes to spend my Saturday nights watching things like the Learning Channel and History Channel, and we actually, at least, somewhat in my mindset, shared by the fascinating language and long ago, one of the best advice—some of the best advice I ever got from a practicing attorney, when I was in law school, is that language is the tool of the lawyer.

> And one of the terms that lawyers like to throw around quite a bit is that of red herring. And that was something I heard, maybe even used a few times before. I thought I better actually figure out what that term actually means.

> And there are a couple of different theories as to how that became part of the English language, but the consensus seems to be that in medieval England, poaching, stealing somebody's game, got you hanged.

> And so what individuals would do, the poachers stealing game, would take red herrings or smelly fish and drag them across the path of the game that they were going to steal, and that would throw off the hunting dogs as they came to retrieve the game that had been caught.

> The defense's entire closing argument, ladies and gentlemen, is nothing but a pile of red herrings, dead fish and it stinks, and we will go through it one by one.

The prosecutor then proceeded to identify arguments raised by defense counsel and referred to many of them as "red herrings." For example, the prosecutor referred to defense counsel's arguments regarding (1) inconsistencies in A.G.'s testimony; (2) Detective Dominguez's failure to record his interview with Alonzo; and (3) the State's failure to procure other forensic evidence tying Alonzo to A.G.'s Tahoe. Alonzo asserts that the "intentional invocation of the worst possible connotation of the term 'red herring' had no purpose but to encourage the jury to believe defense counsel was deceitful."

¶25 We do not find that the prosecutor's exposition on the historical meaning of "red herring"—nor his continued use of that term in

describing defense counsel's arguments—was improperly disparaging. The red herring comments were not personal attacks on defense counsel; rather, they were rebuttal arguments commenting on the weaknesses of counsel's closing arguments. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) (observing that "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations"); *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997) (Criticism of defense theories and tactics is a proper subject of closing argument). Indeed, our supreme court has held that a prosecutor arguing certain questions by defense counsel were "'a defense ploy,' 'improper,' and 'outrageous'" is "well within the latitude afforded both parties in closing argument." *State v. West*, 176 Ariz. 432, 446, 862 P.2d 192, 206 (1993) *overruled on other grounds by State v. Rodriguez*, 192 Ariz. 58, 64 n.7, 961 P.2d 1006, 1012 n.7 (1998); *see also State v. Amaya-Ruiz,* 166 Ariz. 152, 171–72, 800 P.2d 1260, 1279–80 (1990) (finding that prosecutor's arguments that defense counsel "blind-sided witnesses," created a "smoke screen," and relied on "innuendo and inference" to support her "outrageous" argument was "not improper . . . and certainly did not rise to the level of fundamental error"). Accordingly, the prosecutor's use of the term "red herring" did not constitute misconduct, let alone misconduct that denied Alonzo a fair trial.

**¶26** Finally, Alonzo contends that the prosecutor misstated the evidence in closing argument by stating twice, over Alonzo's unsuccessful objection, that defense counsel never asked A.G. at trial whether A.G. had met Alonzo before the night of the robbery. Although we agree that defense counsel posed the question to A.G., we construe the prosecutor's statements as merely a mistake or insignificant impropriety. The single question posed to A.G. appeared in the context of cross-examination that spans approximately 29 pages of transcript and occurred six days before closing argument. The prosecutor's statements did not rise to the level of misconduct. Further, the court properly instructed the jurors that they were to determine the facts of the case only from the evidence presented in court, and the lawyers' closing arguments were not evidence. We must presume the jury followed this instruction. *State v. Herrera,* 174 Ariz. 387, 395, 850 P.2d 100, 108 (1993).

**¶27** For the foregoing reasons, we discern no prosecutorial misconduct; therefore, we cannot find cumulative error. *See State v. Bocharski*, 218 Ariz. 476, 492 ¶ 75, 189 P.3d 403, 419 (2008) ("Absent any finding of misconduct, there can be no cumulative effect of misconduct sufficient to permeate the entire atmosphere of the trial with unfairness.");

*State v. Hughes*, 193 Ariz. 72, 78–79 ¶ 25, 969 P.2d 1184, 1190–91 (1998) (stating general rule of not recognizing cumulative error with the exception of claims involving prosecutorial misconduct).

### III.     **Motions for Mistrial and New Trial**

**¶28**     Because we have determined that the prosecutor did not improperly refer to Alonzo's post-*Miranda* silence or otherwise engage in misconduct that denied Alonzo a fair trial, the trial court did not abuse its discretion in denying Alonzo's motions for a mistrial and a new trial. *See State v. Jones,* 197 Ariz. 290, 304 ¶ 32, 4 P.3d 345, 359 (2000) (stating that trial court's denial of motion for mistrial is reviewed for an abuse of discretion); *State v. Rankovich*, 159 Ariz. 116, 121, 765 P.2d 518, 523 (1988) (stating that denial of motion for new trial based on prosecutorial misconduct is reviewed for abuse of discretion).

### CONCLUSION

**¶29**     For the foregoing reasons, Alonzo's convictions and sentences are affirmed.



Ruth A. Willingham · Clerk of the Court
F I L E D : gsh