NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

JOAO RICARDO GOMES, *Appellant*.

No. 1 CA-CR 21-0340
FILED 11-1-2022

Appeal from the Superior Court in Maricopa County
No. CR2018-143519-001
The Honorable Ronee Korbin Steiner, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Brian R. Coffman
*Counsel for Appellee*

The Law Office of Michael Alarid III PLLC, Phoenix
By Michael Alarid, III (argued)
*Co-Counsel for Appellant*

The Law Office of Elizabeth Mullins, PLLC, Phoenix
By Elizabeth Mullins
*Co-Counsel for Appellant*

---

**MEMORANDUM DECISION**

---

Judge Paul J. McMurdie delivered the Court's decision, in which Presiding Judge Brian Y. Furuya and Judge Jennifer B. Campbell joined.

---

**M c M U R D I E**, Judge:

**¶1**        Joao Ricardo Gomes appeals from his conviction and sentence for sexual conduct with a minor. He argues the superior court erred by denying his motion to suppress evidence, motion for a directed verdict, and motion for a new trial. He asserts the State's misconduct deprived him of a fair trial. And he claims our supreme court's COVID-19 administrative order violated his due process rights. We find no reversible error and affirm.

## FACTS[1] AND PROCEDURAL BACKGROUND

**¶2**        Gomes is Nina's[2] uncle. Nina often stayed the night at Gomes's home, where she spent time with her cousins and aunt. In January 2018, when Nina was ten years old, she slept at Gomes's house after a dance recital. She showered and put on her dance shorts and her aunt's shirt before going to sleep. The shirt originally belonged to Gomes, but her aunt wore it to bed almost every night. Nina slept in her cousin's bed, and her cousin, Gomes's daughter, slept on the trundle bed underneath her.

**¶3**        After Nina went to sleep, she woke up because her cousin was "crying and wanting a bottle." Gomes entered the room and gave her cousin a bottle. Her cousin fell back asleep. Then, Gomes sat on Nina's bed. Nina believed Gomes smelled like alcohol and pretended she was asleep. Gomes lifted her dance shorts, "put his finger where [she] pee[s]," and "scratch[ed]." He also "lick[ed] . . . where [she] peed" and then "put [her] hand where [he] peed." Nina felt pain "[w]here [she] pee[s]." Gomes then left the room. After the assault, Nina used the bathroom and "[i]t burnt

---

[1]        We view the facts in the light most favorable to sustaining the judgment. *State v. Mendoza*, 248 Ariz. 6, 11, ¶ 1, n.1 (App. 2019).

[2]        We use a pseudonym to protect the victim's identity.

when [she] peed." She did not experience this pain before Gomes entered the room.

¶4 The next morning, Nina texted her grandmother that she was sick. Her grandmother retrieved Nina, and they went to the grandmother's house. Later, Nina told her grandmother what had happened the previous night. Nina's mother and aunt came to the house after her grandmother called them. Nina told them what had happened, and Nina's mother called the police.

¶5 Following police department instructions, Nina placed her dance shorts in a plastic bag and took them to the police. Nina's mother drove her to a facility so a forensic nurse could examine her. The nurse examined Nina and swabbed DNA samples from her body. The nurse documented "redness" in the tissue in front of Nina's hymen and labeled the finding "indeterminate." At trial, the nurse testified that physiological variations, poor hygiene, tight clothing, wiping, general irritation, rubbing, or trauma could cause the redness.

¶6 Meanwhile, a detective interviewed Gomes, took pictures of his hands, and swabbed his body for DNA samples. The detective collected Nina's shirt worn when she spent the night at Gomes's home. The police sent Nina's dance shorts and Nina's and Gomes's body samples to the crime laboratory for testing.

¶7 The crime laboratory did not detect male DNA on Nina's anal or vaginal swabs or vaginal aspirate. The laboratory detected small amounts of male DNA on Nina's right-hand swabs and external genital swabs. Nina's dance shorts tested positive for alpha-amylase, an enzyme commonly found in saliva. The Y-STR DNA profile from a sample in the crotch area of Nina's shorts matched Gomes's profile at 23 of 23 loci, meaning Gomes and his paternal line could not be excluded. This specific profile "is not expected to occur more frequently than 1 in 499 Caucasian males[,] 1 in 441 African-American males[,] and 1 in 329 Hispanic males." The laboratory did not test Gomes's body swabs based on their policy that they stop testing DNA samples when they get "comparable results" and can source DNA from a "specific individual."

¶8 In 2018, a grand jury indicted Gomes on two counts of sexual conduct with a minor and two counts of child molestation. Gomes faced charges for "digital/anal penetration" ("Count 1"), "digital/vulva penetration" ("Count 2"), "penis touch" ("Count 3"), and "oral contact with

Victim's genitals" ("Count 4"). Gomes stood trial in 2019. The jury reached an impasse on all counts, causing a mistrial.

¶9　　　　After the first trial, the State directed the crime laboratory to test Nina's shirt the night the incident occurred. The shirt tested positive for saliva and sperm and negative for semen. The Y-STR DNA profile from the saliva sample matched Gomes's profile at 3 of 23 loci. Gomes and his paternal lineage could not be excluded from this result, and the profile is "not expected to occur more frequently than 1 in 29 African-American males[,] 1 in 103 Caucasian males[,] and 1 in 49 Hispanic males."

¶10　　　　Before the retrial, Gomes moved to exclude the new lab results, arguing that the saliva and sperm evidence from the shirt was irrelevant and unfairly prejudicial. The superior court denied the motion, finding the evidence relevant to the State's position that Gomes performed sexual acts with Nina while she wore the shirt. The superior court allowed the defense to present its explanation for the shirt's saliva and sperm to the jury. But the court found the probative value of the new DNA evidence was not substantially outweighed by undue prejudice.

¶11　　　　Before the trial, Gomes objected to the COVID-19 policies in the Arizona Supreme Court Administrative Order 2020-197. The superior court found no constitutional violations. It rejected Gomes's argument that the policy allowing automatic juror exclusion for any COVID-19 reason inhibited the jury from representing a fair cross-section of the community.

¶12　　　　At the retrial, Gomes testified and conceded he went into the bedroom where Nina and his daughter slept that night but claimed he was only helping his daughter fall asleep. Gomes testified he sat near Nina to lean over and soothe his daughter. He claimed he went into the room again to comfort his daughter again. He explained that parts of the bed structure were loose, so when he stood up, he needed to shift Nina back on the bed to prevent her from falling. Additionally, Gomes confirmed he consumed three beers that afternoon and had three or four more alcoholic drinks during the evening and night.

¶13　　　　Gomes moved for a Rule 20 judgment of acquittal on all four counts. The superior court granted the motion for Count 1 but denied the motion for Counts 2, 3, and 4. The jury returned a guilty verdict on Count 2 and found Nina was under 12 and Gomes was over 18.

¶14　　　　Gomes moved for a new trial, arguing the verdict contradicted the weight of the evidence, the prosecutor committed misconduct, and a juror committed misconduct. Acknowledging the

credibility of Nina's testimony and that the defense never challenged the veracity of her statements, the court found the verdict was not contrary to the weight of the evidence. For each of the defense's allegations of prosecutorial error, the superior court either found that the State's actions did not rise to the level of error or, if an error occurred, it did not prejudice Gomes. The court likewise rejected the juror misconduct claim and explained that even if juror misconduct occurred, the defense failed to show it prejudiced Gomes. Thus, the superior court denied the motion.

**¶15** The superior court sentenced Gomes to life in prison with the possibility of release after 35 years. *See* A.R.S. § 13-705(B). Gomes appealed his conviction and sentence. We have jurisdiction under A.R.S. § 12-120.21(A)(1), § 13-4031, and § 13-4033(A).

## DISCUSSION

**A.    The Trial Court Did Not Err by Denying Gomes's Motion to Suppress the DNA Evidence.**

**¶16** On appeal, Gomes argues the court abused its discretion by allowing the State's witness to testify that the crime laboratory found male DNA and sperm on the shirt Nina wore.

**¶17** Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Ariz. R. Evid. 401. A "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Ariz. R. Evid. 403. Evidence is unfairly prejudicial if it has "an undue tendency to suggest decision on an improper basis such as emotion, sympathy or horror." *State v. Schurz*, 176 Ariz. 46, 52 (1993) (citation omitted). The trial court is in the best position to weigh the evidence and has broad discretion under Rule 403. *State v. Harrison*, 195 Ariz. 28, 33, ¶ 21 (App. 1998).

**¶18** At a pretrial hearing, the State's expert confirmed the laboratory found a few sperm on the shirt and a low male DNA level matching Gomes's profile at 3 of 23 loci. Other locations were either inconclusive or lacked sufficient DNA to analyze the profile. The DNA findings tracked the analysis performed on Nina's shorts.

**¶19** Considering the low amount of sperm and male DNA, the State's expert stated the lab results generally conflict with fresh ejaculate. But the expert explained sperm could present on an item without coming from fresh ejaculate because sperm is sturdier than semen. Sperm can

survive the washing machine and transfer among clothing articles. The expert testified it is not uncommon to have low levels of DNA in test results, and findings with low levels of DNA do not make the results unreliable. Similarly, in a specimen with a low sperm rating, the fact that one of two samples did not detect male DNA does not invalidate the serology result. The laboratory assessed the sample for Y-STR rather than a full DNA profile because this sampling is more sensitive and more likely to obtain information from low DNA levels.

¶20 Gomes's wife also testified at the evidentiary hearing. She confirmed she gave Nina the shirt to wear that night. She also verified that she did not wash the shirt after Nina wore it. Gomes's wife testified the shirt was her favorite nightshirt, and she wore it almost every night, including during sexual encounters with her husband. Because the couple used the "pull-out method to prevent pregnancy," the shirt was often exposed to Gomes's ejaculate. She washed the shirt regularly, and it was clean before she loaned it to Nina. Gomes's wife also testified that she and Gomes had not had sex for a month before the incident.

¶21 Gomes did not present contradictory expert testimony. Nor was any evidence presented that another male besides Gomes could have left sperm on the shirt.

¶22 The superior court found the evidence relevant because although the laboratory detected few sperm and low levels of DNA, the testimony could still "support the state's position that [Gomes] engaged in sexual acts with the child while she was in the bed and wearing the t-shirt in question." The court acknowledged that the wife's explanation for the presence of sperm on the shirt could "discount the state's case and theory behind the allegations." But the court found this was a factual dispute to be determined by the jury and that any prejudice did not substantially outweigh the probative value of the evidence.

¶23 On appeal, Gomes argues that the DNA profile results were irrelevant and unfairly prejudicial because they were "inconclusive." Although on 20 of 23 loci the laboratory findings were either inconclusive or insufficient material to analyze, the laboratory obtained findings at three loci. These findings were not inconclusive; they matched Gomes's Y-STR DNA profile. Because Nina wore the shirt that night, the DNA results made it more probable that Gomes committed the sexual acts than if the Y-STR results excluded him. *See* Ariz. R. Evid. 401; *State v. Escalante-Orozco*, 241 Ariz. 254, 275, ¶¶ 57–58 (2017), *abrogated on other grounds by State v. Escalante*, 245 Ariz. 135 (2018).

**¶24**        We cannot say that the DNA evidence unfairly prejudiced Gomes. The jury could consider that the profile matched only 3 of 23 loci. The expert explained anyone in Gomes's paternal lineage would have this profile, including his son, who spent time with Nina. And the jury learned the statistical analysis for the expectancy of this profile in other males in the population.[3] Thus, the superior court did not abuse its discretion by finding that this information was not unfairly prejudicial and that the test results' limits went to the weight of the evidence. *See Escalante-Orozco*, 241 Ariz. at 274, ¶ 48 (A Y-STR DNA profile match at five loci was not unfairly prejudicial because "the jury could readily understand" the evidence's limitations and "give the evidence whatever weight it deserved.").

**¶25**        Gomes also asserts the superior court abused its discretion by allowing evidence that the laboratory detected sperm on the shirt. He rejects its relevance by emphasizing there was no semen on the shirt and only a few sperm, so it is more likely that the sperm presented from a prior sexual encounter with his wife. But the parties do not dispute that Nina wore the shirt that night. That the shirt contained sperm could make it more probable Gomes committed sexual acts with Nina than it would be without this evidence. *See* Ariz. R. Evid. 401. The jury also heard evidence and argument about the samples' low levels of male DNA and the alternative explanations for why the sperm might have been on the shirt. *See State v. Burns*, 237 Ariz. 1, 17, ¶ 47 (2015) (Source uncertainty goes to the weight of the evidence, not its admissibility.).

**¶26**        Gomes also argues the mention of sperm on the shirt was "extraordinarily prejudicial and confusing to the jury." "But not all harmful evidence is unfairly prejudicial." *Schurz*, 176 Ariz. at 52. The jury learned of the evidence's limitations, such as the number of sperm found were few, the sperm could have been present from past sexual encounters with Gomes's wife, and the sperm could survive the washing machine. The evidence was not so prejudicial to drive the jury to decide guilt based on

---

[3]        In his opening brief, Gomes claims the laboratory issued an amended report about the Y-STR statistics several months after the trial. He asserts the amended statistics make the match "even less significant than testified to at this hearing and ultimately at trial." But the appellate record does not include the amended report. We thus cannot consider the issue. *See State v. Rivera*, 168 Ariz. 102, 103 (App. 1990). If Gomes believes the amended statistics would have changed his judgment, he can file for post-conviction relief. *See* Ariz. R. Crim. P. 32.1(e).

"emotion, sympathy or horror." *Id.* The superior court did not abuse its discretion by finding this evidence relevant and not unfairly prejudicial.

**¶27** Finally, Gomes argues he was prejudiced by the superior court's denial of the motion to suppress. He points to the hung jury in his first trial, coupled with the conviction in the second trial, to claim the newly admitted evidence from the shirt unduly influenced the jury's judgment in the second trial.

**¶28** We do not know what evidence the jury used in either trial to support its findings. We cannot know whether the jury considered the laboratory's findings from the shirt to convict Gomes on Count 2. *See State v. Kolmann*, 239 Ariz. 157, 161, ¶ 15 (2016) ("As a general rule, no one . . . has a 'right to know' . . . how a decision was reached by a jury or juror. The secrecy of deliberations is the cornerstone of [the] jury system.") (quoting *United States v. Thomas*, 116 F.3d 606, 618 (2d Cir. 1997)). But the jury convicted Gomes on only one count, which suggests the evidence did not unduly influence the jury. *See State v. Herrera*, 232 Ariz. 536, 548, ¶ 32 (App. 2013). And, as explained above, the superior court did not abuse its discretion by admitting the evidence.

**¶29** We find no reversible error.

**B. The Trial Court Did Not Err by Denying Gomes's Motion for a Rule 20 Judgment of Acquittal.**

**¶30** Gomes argues the record lacks sufficient evidence to warrant a conviction. In denying Gomes's Rule 20 motion, the superior court found Nina's and the forensic nurse's testimonies contained substantial evidence to allow the jury to decide the case. We agree.

**¶31** We review a sufficiency-of-the-evidence claim *de novo. State v. West*, 226 Ariz. 559, 562, ¶ 15 (2011). A court must enter a judgment of acquittal if there is "no substantial evidence to support a conviction." Ariz. R. Crim. P. 20(a)(1). "Substantial evidence" is proof that "reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *State v. Jones*, 125 Ariz. 417, 419 (1980). "When reasonable minds may differ on inferences drawn from the facts, the case must be submitted to the jury, and the trial judge has no discretion to enter a judgment of acquittal." *State v. Lee*, 189 Ariz. 590, 603 (1997). The court cannot "re-weigh the facts or disregard inferences that might reasonably be drawn from the evidence." *West*, 226 Ariz. at 563, ¶ 18.

¶32        Gomes argues the record lacks sufficient evidence to convict him because Nina never specifically alleged penetration in her testimony. To convict Gomes on Count 2, the jury had to find beyond a reasonable doubt that he "intentionally or knowingly engag[ed] in sexual intercourse or oral sexual contact with any person who is under eighteen years of age." A.R.S. § 13-1405(A). "'Sexual intercourse' means penetration into the penis, vulva or anus by any part of the body." A.R.S. § 13-1401(A)(4). Proof of vaginal penetration is not required to convict a defendant of sexual conduct with a minor. *See State v. Marshall*, 197 Ariz. 496, 506, ¶ 39 (App. 2000).

¶33        At trial, Nina testified Gomes "put his finger where [she] pee[s]" and "started scratching where [she] peed." Nina said when Gomes touched her, she felt pain "[w]here [she] pee[s]" and that when she used the bathroom afterward, "[i]t burnt when [she] peed." When examining Nina, the forensic nurse noted an "area of redness" in the "vestibule tissue," which is a space "in front of the hymen, past the labia majora." Based on the redness's location, urine would pass over it, so the nurse stated Nina's painful urination could relate to the redness.

¶34        The nurse confirmed that "vulva" means "all of the external genital parts of the girl," including the urethra, the hymen, and the labia minora and majora. The nurse pointed to a diagram showing the labia, the urethra, the vestibule tissue between the labia minora and the hymen, the hymen and the vaginal opening. Because the labia surround the hymen and the urethra, and the labia are part of the vulva, someone must penetrate the vulva to reach the urethra. Gomes never disputed or contradicted the nurse's expert testimony.

¶35        Although Nina did not specifically use the word "penetrate," the jury could reasonably find that Gomes penetrated Nina based on her testimony combined with the nurse's explanation. Even the "slightest penetration of the vulva" is still penetration. *See State v. Scott*, 105 Ariz. 109, 110 (1969). Given Nina's and the nurse's testimony outlined above, the jury could reasonably infer that Gomes's touching caused Nina's pain and irritation. For this to happen, Gomes would have to pass through the labia to reach the vestibule area in front of the hymen. Because the labia are part of the vulva, and the jury could find Gomes passed through the labia, the evidence supports a finding of vulvar penetration.

¶36        Gomes argues it is unreasonable to infer that touching someone "where [they] pee" implies urethral penetration. But the penetration of the urethra is not required under the statute. *See* A.R.S. § 13-1401(A)(4). Penetration of the vulva is all that is necessary, and as

explained, the jury could reasonably find that Gomes penetrated Nina's vulva.

¶37        Gomes highlights that the nurse's redness finding was indeterminate, and there were several possible explanations for the redness. But that the nurse's finding was indeterminate does not mean she concluded no penetration occurred. The nurse could not say sexual assault caused the redness, but she also could not rule out sexual assault, as the redness could have been from trauma. It is not this court's role to re-weigh the evidence or re-assess inferences drawn from it. *Lee*, 189 Ariz. at 603; *West*, 226 Ariz. at 563, ¶ 18. Considering Nina's and the nurse's testimonies, substantial evidence established that a reasonable person could find Gomes guilty on Count 2. Thus, the superior court did not err by denying Gomes's Rule 20 motion.

**C.        The State Did Not Commit Prosecutorial Error.**

¶38        Gomes contends that the State engaged in misconduct that deprived him of a fair trial. Prosecutorial error occurs where the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Morris*, 215 Ariz. 324, 335, ¶ 46 (2007) (quoting *State v. Hughes*, 193 Ariz. 72, 79, ¶ 26 (1998)). We will reverse a conviction if the appellant shows that 1) an error occurred and 2) there is a reasonable likelihood that the error could have affected the jury's verdict. *Id.*

¶39        Gomes alleges several instances of error on appeal. We review each allegation individually and conclude that each time, either the State did not err or any alleged error did not prejudice Gomes. Moreover, the cumulative effect of the State's actions did not deprive Gomes of a fair trial.

**1.        The State Followed the Superior Court's Evidentiary Ruling.**

¶40        Before the trial, the superior court ruled that neither party could "elicit testimony regarding [Gomes] proposing sex to his wife and/or her rejection of his offer when he went to bed." But the court allowed the parties to ask witnesses about the timeline and "context of [Gomes] getting into bed, waking up his wife, and what happened thereafter." Gomes asserts the State's cross-examination of Gomes's wife "skirt[ed]" the superior court's evidentiary ruling.

¶41        At trial, the State asked Gomes's wife, "[Y]ou made it sound kind of like when he comes in to wake you up that he is just getting in bed,

but he . . . actually is coming in to wake you up; is that fair to say?" The defense objected, citing the court's ruling. The State clarified it sought to show that Gomes was intoxicated that night, and the defense responded, "[T]hat's okay to say." Later, the State asked Gomes's wife, "And is it fair to say . . . that he probably might have been a little drunk to have maybe not thought twice before trying to wake you up at 1:30?" Gomes did not object.

¶42        The jury later asked about Gomes's motive for waking up his wife. Jurors requested that the court ask Gomes's wife whether he was trying to do anything sexually. The defense objected to these questions. Although the superior court disagreed with Gomes's objection and thought "it's a natural question by a juror to wonder . . . why [Gomes] woke her up," the court did not ask the witness any of the jury's questions.

¶43        Gomes asserts that the State deliberately implied that Gomes "proposed or attempted to initiate sex with his wife" and that "he was rebuffed." Gomes argues the jurors' questions show the State's questioning successfully implied he had a sexual motive for waking up his wife.

¶44        The State's cross-examination did not violate the superior court's ruling on the motion *in limine*. The superior court ruled that the parties could ask witnesses about Gomes going to bed and waking up his wife. The State asked just that. The State clarified it sought to show Gomes was intoxicated, and the defense approved. The jury's curiosity about Gomes's intentions does not mean the State suggested he had a sexual motive. The State's questioning was not improper.

¶45        Even if the State erred, there is no "reasonable likelihood" that the error could have affected the jury's verdict. *Morris*, 215 Ariz. at 335, ¶ 46. Because the superior court did not ask the jury questions, the witness never spoke about Gomes's motive for waking her up. And the superior court instructed the jury they "should not guess about any fact." We presume the jury followed these instructions. *Id.* at 337, ¶ 55. Thus, Gomes fails to show the State committed prosecutorial error warranting reversal.

**2.        Gomes Fails to Show the State's Comments and Gestures During Trial Were Improper.**

¶46        Gomes asserts the State made "repeated argumentative comments" during cross-examination of the defense witnesses. Gomes says the State often commented on the witness's answers before asking additional questions. For example, the State followed Gomes's testimony about how he saw Nina eating a waffle by saying, "Interesting way to hold

a waffle, right." He cites other instances when the prosecutor commented during cross-examination. He also argues the State made "numerous facial expressions and hand gestures during testimony of the defense expert, the defendant, and the defense's closing argument."

**¶47** The defense never objected to these comments, gestures, or facial expressions before the superior court, so we review them for fundamental error. *Morris*, 215 Ariz. at 335, ¶ 47. First, we determine whether the State erred. *State v. Murray*, 250 Ariz. 543, 548, ¶ 14 (2021). If a trial error occurred, we then decide whether the error is fundamental. *Id.* The defendant must also prove prejudice by showing that a reasonable jury could have reached a different result without the error. *Escalante*, 245 Ariz. at 144, ¶ 29.

**¶48** Gomes identifies no record evidence of the prosecutor's facial expressions or hand gestures. Thus, we cannot assess whether the State erred. *See State v. Zuck*, 134 Ariz. 509, 513 (1982) (If there is no record to consider, we cannot review the claim's merits.). Gomes also fails to show how the State's alleged expressions and hand gestures prejudiced the jury. *See State v. Martin*, 225 Ariz. 162, 166, ¶ 15 (App. 2010) ("Speculative prejudice is insufficient under fundamental error review.").

**¶49** As for the prosecutor's comments, Gomes fails to explain how they affected the outcome of his trial. And the superior court cured any potential error by instructing the jury that "[w]hat the lawyers said or say is not evidence." *See Morris*, 215 Ariz. at 337, ¶ 55 ("Even if the prosecutor's comments were improper, the judge's instructions negated their effect."). As a result, Gomes fails to prove error occurred, much less fundamental, prejudicial error.

### 3. The State Did Not Elicit False Testimony.

**¶50** Gomes argues the State improperly elicited testimony from Nina's grandmother that the State knew was "provably false."

**¶51** During rebuttal, the State asked Nina's grandmother if Gomes was acting unusual on the day of the incident when she arrived at the house to pick up Nina. The State also asked Nina's grandmother what time she called Gomes's wife, and she responded that she called around noon. The State then asked if she had received a phone call from Gomes about their library plans that week, and Nina's grandmother confirmed he called her around 1:30 p.m.

¶**52**        When cross-examining Nina's grandmother, the defense asked about Gomes's 1:30 p.m. phone call. The defense asked Nina's grandmother whether a phone call from Gomes to his wife was "made after the calls to [her]." The superior court sustained objections to the defense's questions because it was suggested that the witness read directly from phone records not admitted into evidence.

¶**53**        Gomes claims Nina's grandmother testified that Gomes called her after learning about the allegations against him, and the State knew this was false. When answering the State's questions, Nina's grandmother never testified that Gomes called her after learning about the allegations. The State asked Nina's grandmother what time Gomes called her, not when he knew about the allegations. Only the defense asked about the timing of Gomes's phone conversation with his wife, and this prompted the grandmother to suggest that Gomes called her after talking to his wife and learning about the allegations. If it was error, the defense invited it. *See State v. Logan*, 200 Ariz. 564, 565–66, ¶ 9 (2001) ("[W]e will not find reversible error when the party complaining of it invited the error."). The State did not err when it questioned Nina's grandmother.

### 4.        The State's Closing Arguments Were Not Improper.

¶**54**        Gomes asserts that during closing arguments, the State made improper arguments that 1) "impugned the integrity of the defense," 2) vouched for the victim and intentionally evoked an emotional response, 3) implied facts not in evidence, 4) shifted the burden of proof to the defense, and 5) implied the jury had a duty to convict Gomes. We conclude the State did not err.

¶**55**        Prosecutors have "wide latitude" when presenting closing arguments to the jury. *State v. Comer*, 165 Ariz. 413, 426 (1990). In closing arguments, attorneys can summarize the evidence, ask the jury to draw reasonable inferences from the evidence, and suggest conclusions. *State v. Goudeau*, 239 Ariz. 421, 466, ¶ 196 (2016). Courts "look[] at the context in which the statements were made as well as 'the entire record and to the totality of the circumstances.'" *State v. Nelson*, 229 Ariz. 180, 189, ¶ 39 (2012) (quoting *State v. Rutledge*, 205 Ariz. 7, 13, ¶ 33 (2003)).

### i.        The State Did Not Impugn the Defense Counsel's Integrity.

¶**56**        During rebuttal closing arguments, the State said the defense did not fulfill its opening statements' promises, had a "shotgun-everything" approach, and called the defense's theories "nonsense" and

"distractions." Gomes argues these statements and many others impugned his counsel's integrity.

¶57　　　　Impugning opposing counsel's honesty or integrity is improper. *Hughes*, 193 Ariz. at 86, ¶ 59. But the State did not attack the defense counsel's honesty or integrity. Rather, the State criticized the defense's strategy, a "proper subject of closing argument." *State v. Ramos*, 235 Ariz. 230, 238, ¶ 25 (App. 2014) ("Although some of the prosecutor's comments suggested that defense counsel was attempting to mislead the jury, we cannot say that those statements did more than criticize defense tactics."). The superior court also instructed the jury that what the attorneys "said or say is not evidence" and that sympathy or prejudice could not influence their verdict. Because we assume the jurors followed these instructions, no error occurred. *Morris,* 215 Ariz. at 337, ¶ 55.

### ii.　　The State Did Not Vouch for the Victim or Improperly Appeal to the Jury's Emotions.

¶58　　　　Gomes contends the State "engaged in improper argument by vouching for the victim and making comments solely intending to evoke an emotional response." Gomes points to three passages in the State's closing arguments. First, the State said Nina "was on the stand for a while and was attacked for a while," and "the only things that defense could bring up" were questioning her about the cracked bedroom door and Nina's identification of Gomes. Second, the State argued, "[The defense is] not saying [Nina] lied because, perhaps, her testimony [was] so credible . . . but he is saying that she was lying, because [Nina] said this was not a dream." The State said, "either [Nina] got up there and told you all the truth," or the defense's "shotgun-everything approach" is true. Third, when discussing that the laboratory did not test Gomes's body swab samples, the State told the jury they should not hold the lab's procedure against Nina and that "anyone could have tested those samples." Because Gomes did not object at trial, we review these statements for fundamental error. *Morris*, 215 Ariz. at 335, ¶ 47.

¶59　　　　Counsel impermissibly vouches for a witness when they personally assure a "witness's veracity" or "bolster a witness's credibility by reference to matters outside the record." *State v. King*, 180 Ariz. 268, 277 (1994) (quoting *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980)). Although the State did say Nina's "testimony was so credible" in their closing arguments, the prosecutor did not personally vouch for Nina's credibility. The State used the phrase to highlight that the defense never challenged the truth of Nina's statements and instead said she dreamt of

the incident. Rather than assuring the jury that Nina told the truth, the State said the jury had to decide whether Nina "told [them] the truth."

**¶60** Nor did the State vouch for Nina's credibility by saying the jury should not hold the lack of testing on Gomes's body samples against her. Instead, it refuted the defense's argument that the "State never tested" the samples. *See State v. Alvarez*, 145 Ariz. 370, 373 (1985) ("Prosecutorial comments which are a fair rebuttal to areas opened by the defense are proper."). Nor did the State refer to matters outside the record. Because the State did not impermissibly vouch for Nina, the State did not err.

**¶61** Counsel improperly appeals to the jury's emotions when their statements "urge the jury 'to convict [the] defendant for reasons wholly irrelevant to his own guilt or innocence.'" *State v. Acuna Valenzuela*, 245 Ariz. 197, 222, ¶ 109 (2018) (quoting *State v. Herrera*, 174 Ariz. 387, 397 (1993)). "We encourage jurors not to decide cases based on emotion or sympathy." *State v. Moody*, 208 Ariz. 424, 461, ¶ 156 (2004). None of the passages cited by Gomes urge or even imply that the jury should convict Gomes for reasons other than his guilt. Thus, we find no error.

### iii. The State Did Not Imply Facts Not in Evidence.

**¶62** Gomes argues the State "implied facts not in evidence" by showing the jurors a PowerPoint slide that contained the word "[c]onfession." He asserts the slide unduly prejudiced the jury by suggesting Gomes confessed, even though he did not. When the State presented this slide, Gomes objected. The court sustained the objection and instructed the State to clarify that Gomes did not confess. The State continued its closing argument and said a signed confession "doesn't exist here, but that cannot be the standard that someone could get away with this." Because the State clarified that Gomes did not confess, there is no "reasonable likelihood" that the slide affected the jury's verdict. *Morris*, 215 Ariz. at 335, ¶ 46.

### iv. The State Did Not Shift the Burden of Proof to Gomes.

**¶63** Gomes claims the State "improperly place[d] the burden of proof on the defendant" when the State questioned a witness about why the crime laboratory did not test Gomes's body samples and argued in closing that "anyone could have tested those samples." The prosecution cannot shift its burden of persuasion to the defense. *See Sandstrom v. Montana*, 442 U.S. 510, 524 (1979). That said, the prosecution can ask questions about a party's ability to test or examine the evidence, even if this supports an inference that the evidence would be unfavorable to him. *See*

*State v. Vargas*, 251 Ariz. 157, 177, ¶ 72 (App. 2021); *State v. Lehr*, 201 Ariz. 509, 522, ¶¶ 55–57 (2002).

¶64 Also, the State can "comment on the defendant's failure to present exculpatory evidence." *State ex. rel. McDougall v. Corcoran*, 153 Ariz. 157, 160 (1987) (The prosecution's remarks in closing arguments that the defendant chose not to test a breath sample were "simply comments designed to draw reasonable inferences based on [the defendant's] failure to present [potentially exculpatory] evidence."). The State's actions were not improper. And because the superior court instructed the jury to disregard this comment, there is no "reasonable likelihood" that the comment affected the jury's verdict. *Morris*, 215 Ariz. at 335, ¶ 46. We find no error.

### v. The State Did Not Say the Jury Had a Duty to Convict Gomes.

¶65 Gomes asserts the State "improperly argued the jury had a duty to convict." In closing, the State told the jury, "[I]t is your duty as jurors . . . to apply the law to the evidence" and, "[J]ustice requires that you return a verdict of guilty." Because Gomes did not object at trial, we review these statements for fundamental error. *Morris*, 215 Ariz. at 335, ¶ 47.

¶66 Here, the State did not say that the jury had a duty to convict but that 1) the jury had a duty to apply the law to the evidence and 2) justice requires a guilty verdict. Prosecutors have "wide latitude in presenting their closing arguments." *Herrera*, 174 Ariz. at 396. We cannot say that the State's comments were so improper that they unduly prejudiced Gomes, especially considering the jury instruction that what attorneys "said or say is not evidence." Even if the statements were inappropriate, Gomes fails to demonstrate the prejudice necessary to show the State committed fundamental error.

### 5. The Effect of the State's Actions Did Not Deprive Gomes of a Fair Trial.

¶67 Gomes contends the State's actions taken "as a whole" warrant a new trial. Even if prosecutorial error by itself does not warrant reversal, it may "contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct . . . 'to prejudice the defendant.'" *Morris*, 215 Ariz. at 335, ¶ 47 (quoting *State v. Roque*, 213 Ariz. 193, 228, ¶ 155 (2006), *abrogated on other grounds by Escalante-Orozco*, 241 Ariz. at 267).

¶68 "Absent any finding of misconduct, there can be no cumulative effect of misconduct sufficient to permeate the entire atmosphere of the trial with unfairness." *State v. Bocharski*, 218 Ariz. 476, 492, ¶ 75 (2008). Because the State did not commit prosecutorial error, and Gomes failed to show how the State's actions cumulatively affected his trial, Gomes's trial was not so infected with unfairness that he was denied due process. *See Morris*, 215 Ariz. at 335, ¶ 46.

**D.     The Trial Court Did Not Err by Denying Gomes's Motion for a New Trial.**

¶69 Gomes argues the superior court abused its discretion by denying his motion for a new trial because the guilty verdict conflicted with the weight of the evidence, a juror committed misconduct, and the State committed misconduct. We will not disturb a trial court's ruling on a motion for a new trial absent an abuse of discretion. *State v. Gulbrandson*, 184 Ariz. 46, 60 (1995). The trial court can grant a new trial if the verdict contradicts the weight of the evidence, the State is guilty of misconduct, or a juror committed misconduct. Ariz. R. Crim. P. 24.1(c).

> **1.     The Superior Court Did Not Abuse Its Discretion by Finding the Verdict Was Not Contrary to the Weight of the Evidence.**

¶70 Gomes argues "the evidence presented at this trial was insufficient to support a guilty verdict." Gomes asserts that because Nina never specifically alleged penetration and the forensic nurse's findings were indeterminate, his guilty verdict conflicts with the weight of the evidence.

¶71 Appellate courts will "defer to the factual findings of the jury and generally will not set aside the verdict unless no evidence supports it." *State v. Fischer*, 242 Ariz. 44, 49, ¶ 15 (2017). On a motion for a new trial, the "trial court may weigh the evidence and make its own determination of the credibility of the witnesses." *Id.* at 49, ¶ 17. "To set aside a jury verdict for insufficient evidence, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support the conclusion reached by the jury." *State v. Arredondo*, 155 Ariz. 314, 316 (1987).

¶72 The superior court ruled the record supported the verdict and was not contrary to the weight of the evidence. The superior court found Nina's testimony credible, emphasizing that the defense never challenged the truth of her statements. Rather, the defense's theory was Nina genuinely believed Gomes sexually assaulted her but that she dreamt the incident. The

superior court found Nina's testimony sufficient to support the jury's finding that a crime occurred.

¶73        We defer to the superior court's findings on witness credibility. *See Fischer*, 242 Ariz. at 50, ¶ 21. And as discussed, Nina's testimony and the forensic nurse's findings supported the jury's verdict.

¶74        Gomes points to the hung jury in his first trial to show that the verdict in the second trial deviated from the weight of the evidence. But the superior court explained, "there are many reasons why the outcome of one trial is different than another." The superior court did not abuse its discretion by denying Gomes's motion for a new trial.

### 2.        The Superior Court Did Not Abuse Its Discretion by Denying Gomes's Motion Based on Juror Misconduct.

¶75        Gomes argues the superior court erred by denying his motion for a new trial because a juror's misconduct prejudiced his defense. He asserts a jury member willfully failed to reveal he was an attorney and worked at a law firm that practiced child sexual abuse litigation. Gomes also claims he would have exercised a peremptory strike if the juror had revealed he was a personal injury attorney.

¶76        A juror commits misconduct by "willfully failing to respond fully to a direct question posed during the voir dire examination." Ariz. R. Crim. P. 24.1(c)(3)(C). "Juror misconduct warrants a new trial only if 'the defense shows actual prejudice or if prejudice may be fairly presumed from the facts.'" *State v. Davolt*, 207 Ariz. 191, 208, ¶ 58 (2004) (emphasis omitted) (quoting *State v. Miller*, 178 Ariz. 555, 558 (1994)).

¶77        During *voir dire*, when asked about his background, the juror said, "I'm self-employed. I own several businesses. . . . The type of work I do is, one, a law firm, and the other is residential real estate." The State asked about "the nature of the law firm" and what kind of cases it handled. The juror responded, "So like personal injury, wrongful death, some bankruptcy and contract law." Neither party followed up with the juror about his employment.

¶78        The superior court found that "the juror did not fail to inform the lawyers or the court of his areas of employment." The court reasoned the juror "could have shared more information" but that he did disclose his occupation, and neither party took the opportunity to follow up with him. The court found the defense's position that they would have exercised a peremptory strike "dubious" because the juror did inform them that the

firm practiced personal injury law. The superior court found no prejudice to Gomes. It reasoned that even if the law firm practiced sexual abuse litigation, Gomes failed to provide evidence that the juror performed that work or that he could not be fair and impartial if he did.

¶79 The superior court did not abuse its discretion by finding the juror's actions did not rise to the level of misconduct. The juror did tell the parties he owned businesses and "[t]he type of work [he did] is . . . a law firm." When asked, he disclosed the firm handled personal injury cases. That said, Gomes did not follow up with the juror to clarify the juror's role with the law firm.

¶80 Gomes offered no evidence that the juror practiced sexual abuse litigation and failed to explain why the juror would not have been fair or impartial. Knowing the juror worked in some capacity with a law firm that handled personal injury cases, the defense could have asked follow-up questions but chose not to do so. As a result, the superior court did not abuse its discretion by rejecting Gomes's jury misconduct claim.

### 3. The Superior Court Did Not Abuse Its Discretion by Finding the State Did Not Commit a *Brady* Violation.

¶81 Gomes argues that "a new trial should have been ordered" because "a serious *Brady* violation occurred." After the trial, the State disclosed a report containing three allegations of misconduct "sustained" against a crime scene technician who participated in Gomes's investigation. This employee impounded evidence and took photographs throughout Gomes's home while the police executed a search warrant. The attorneys used the pictures at trial to establish the layout of Gomes's home, the appearance of Gomes's hands, and what Gomes and Nina wore that day. The employee did not testify at trial, as other witnesses laid the foundation for the photographs.

¶82 In his motion for a new trial, Gomes argued the State violated *Brady v. Maryland*, 373 U.S. 83 (1963) when it disclosed information about the crime lab employee only after the verdict. The superior court found the State did not err because Gomes "failed to establish that potential cross-examination of [the specialist] would have changed the outcome in this matter," and the information "would have played no role in the guilty verdict."

¶83 On appeal, Gomes argues a new trial was warranted because if he had known about the internal affairs report, the defense would have called the employee as a witness. "Under *Brady*, the State violates a

defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 565 U.S. 73, 75 (2012). Evidence is material if there is a reasonable probability that the outcome would have been different had the evidence been disclosed. *Id.* A reasonable probability exists where "the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" *Id.* at 75–76 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). "The test for a *Brady* violation is whether the undisclosed material would have created a reasonable doubt had it been presented to the jury." *State v. Montano*, 204 Ariz. 413, 424, ¶ 52 (2003) (quoting *State v. Dumaine*, 162 Ariz. 392, 405 (1989)).

¶84　　　　Gomes fails to show the internal affairs report was material or exculpatory. At trial, neither party disputed what clothes the parties wore, the home layout, or the accuracy of the photographs. Other witnesses established these facts through their testimony. Having the employee testify and raising her past misconduct would not have impacted the verdict. Thus, there is no reasonable probability that impeaching the employee's credibility would have created reasonable doubt or undermined the trial's outcome. *See Smith*, 565 U.S. at 75; *Montano*, 204 Ariz. at 424, ¶ 52. Because the evidence is not material or exculpatory, the superior court did not abuse its discretion by denying Gomes's motion.

¶85　　　　Finally, as discussed, the State did not commit prosecutorial error. We, therefore, hold the superior court did not abuse its discretion by denying Gomes's motion for a new trial.

## E.　The Superior Court Did Not Err by Denying Gomes's Objection to Administrative Order 2020-197.

¶86　　　　Before trial, Gomes challenged COVID-19 restrictions in Administrative Order 2020-197. He objected to three provisions that 1) suspended the right to a change of judge, 2) limited parties to two peremptory strikes, and 3) gave the trial court discretion to require masks. The superior court overruled his objections. On appeal, Gomes argues that the provisions mentioned above from the administrative order violated his due process rights and his right to a fair trial. He also contends that because of the COVID-19 pandemic, the jury did not represent a fair cross-section of the community. This court reviews constitutional issues *de novo*. *State v. Carlson*, 237 Ariz. 381, 398, ¶ 64 (2015).

¶87　　　　Gomes argues the administrative order arbitrarily modified rules suspending the right to change judges and limiting parties to two

peremptory strikes. But defendants do not have constitutional rights to peremptory challenges or to be heard by a particular judge. *Ross v. Oklahoma*, 487 U.S. 81, 88–89 (1988); *State v. Reid*, 114 Ariz. 16, 21 (1976). Gomes's claim that the jurors "did not represent a fair cross-section of the community" also fails because he offered no evidence that any group was excluded or underrepresented "due to systematic exclusion." *See State v. Murray*, 184 Ariz. 9, 23 (1995).

**¶88** Gomes also argues that the court's mask requirement deprived him of a fair trial because the jury could not assess the witnesses' credibility, and his counsel could not effectively advocate for him while masked. Gomes fails to point to any portion of the record that shows the court's masking and social-distancing policies affected his trial. *See Zuck*, 134 Ariz. at 513 ("Where matters are not included in the record on appeal, the missing portions of the record will be presumed to support the action of the trial court."). Many courts during the COVID-19 pandemic agreed that mask requirements and other related social-distancing policies did not deprive defendants of fair trials. *See, e.g., United States v. James*, No. CR-19-08019-001-PCT-DLR, 2020 WL 6081501, at *2 (D. Ariz. Oct. 5, 2020) ("[T]he mask requirement does not significantly obstruct the ability to observe demeanor."). The superior court acted within its discretion when enforcing masking and social-distancing measures to prevent the spread of COVID-19. *See also Gamboa v. Metzler*, 223 Ariz. 399, 402, ¶ 13 (App. 2010) (Trial courts have "broad discretion over the management of a trial.").

**¶89** The administrative order did not violate Gomes's constitutional rights.

## CONCLUSION

**¶90** We affirm.

